[No. B236874. Second Dist., Div. One. Oct. 26, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JIMMY GONZALEZ, Defendant and Appellant.

▋▋▋▋▋▋▋
▋▋▋▋▋▋▋▋▋▋

COUNSEL

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Attorney General, Margaret E. Maxwell and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**JOHNSON, J.**—A jury convicted Jimmy Gonzalez of first degree murder, and the trial court sentenced Gonzalez to 80 years to life in state prison. Gonzalez appeals. We affirm.

## BACKGROUND

An information filed July 9, 2009, charged Gonzalez and his codefendant Sheena Santos with one count of first degree murder of Mikko Brooks, in violation of Penal Code[1] section 187, subdivision (a). The information alleged that a principal personally and intentionally discharged a firearm (a rifle) causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)), personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)), and personally used a firearm (§ 12022.53, subds. (b) & (e)). The information also alleged that Gonzalez had a prior serious or violent felony conviction (§§ 1170.12, subds. (a)–(d), 667, subds. (b)–(i)), a prior serious felony conviction (§ 667, subd. (a)(1)), and had served three prior prison terms (§ 667.5, subd. (b)). Gonzalez pleaded not guilty and denied the allegations. Gonzalez and Santos were tried together, with separate juries.

*The murder of Mikko Brooks*

At trial, Dayanara Barrett testified that shortly after 6:30 a.m. on January 9, 2008, she received a phone call from her friend Mikko Brooks. Brooks told Barrett it was an emergency, and asked Barrett to come over to Brooks's apartment in Bellflower. Barrett could hear music and other voices in the background.

Barrett dropped her son off at school and about 8:00 a.m. went over to Brooks's apartment. Barrett noticed that the gate and the door to the apartment were open, and a computer keyboard was on the floor about four to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

five feet inside the door—that was unusual—as Brooks kept the door and gate locked and kept a very tidy house. Barrett entered the apartment and saw that the cabinets were open and the apartment looked as if it had been ransacked. She found Brooks in her bedroom, tied up in the corner of the room; when Barrett called out Brooks's name, she did not answer or move. Barrett immediately dialed 911 on her cell phone and ran out of the building, waiting with the neighbors until the police arrived five minutes later.

Marni Hernandez testified that at 8:30 a.m. on the same day, January 9, 2008, she was sitting in a car outside a medical office next to the apartment complex. Through her rearview mirrors, she saw a man with a shaved head come out of the apartment complex, wearing a black short-sleeved shirt. She could not see his face, but thought the man was young. She saw the man a second time, carrying a computer monitor. Hernandez then saw the man a third time, leaving the apartment complex carrying what looked like a VCR. A young woman was walking next to him; Hernandez could not see her face. Hernandez did not see where the man went. Hernandez saw Barrett walk into the apartment building about 10 minutes after she last saw the man walk out. Barrett came out yelling and asked someone for help; Hernandez stayed where she was, and later told the police what she had seen. At the preliminary hearing, Hernandez had testified that the woman and man were tall, and the woman was close to six feet tall, with long black hair.

Chasity Phillips testified that Brooks, the victim, was her cousin. Brooks had a young Hispanic woman living with her. Phillips met the woman (who was with a man) at Brooks's apartment about three days before Brooks's murder. Phillips recognized the woman as looking like someone in the courtroom.[2] Brooks called Phillips later and told her she had put the woman out. To the police, Phillips had identified a photograph, labeled exhibit 6, as the woman, and a photograph, labeled exhibit 7, as the man.[3] Brooks was not a gang member, although she had some problems in her life, and when she was younger Brooks had hung out with the Rolling 20's. She was street-smart and could hold her own in a fight. Brooks had told Phillips she let the woman stay in the apartment because she was pregnant. The woman did not look pregnant.

---

[2] Asked to identify who in the courtroom was the person who lived with Brooks, Phillips identified a juror.

[3] In opening argument the prosecutor stated that Phillips would identify Santos as Brooks's roommate. In closing argument, the prosecutor stated that Gonzalez's codefendant, Santos, had been identified as the woman living with Brooks, and Phillips had identified the man with her the day Phillips visited as Santos's boyfriend Luis Sandoval (Gumby).

Los Angeles County Deputy Sheriff Lorena Rodriguez testified that she responded to a radio call on January 9, 2008, arriving at Brooks's apartment at 8:30 a.m. The security door was open, and Barrett was crying and talking to another deputy, who had arrived earlier. Deputy Rodriguez noticed that the apartment was "messed up," and in the bedroom she found Brooks lying on her stomach, with her ankles bound to her wrists with a telephone cord. Brooks had a gray towel on top of her head, and there was blood where her head rested. The room had been ransacked. After determining that Brooks was dead, the deputies left the apartment and waited for homicide detectives.

Deputy Sheriff Boyd Zumwalt testified that as one of the investigating officers from the homicide bureau, he went to Brooks's apartment on January 9, 2008. He saw no signs of forced entry. A keyboard, CD or DVD cases, a cable television control box, and a DVD player were on Brooks's living room couch. In the bedroom was Brooks's body, trussed up. An expended cartridge case was in the corner of the room. Brooks had wounds to her face and a gunshot wound through her head. Brooks had a "20 Crip" tattoo, meaning the Rolling 20's gang out of Long Beach.

The entertainment center near Brooks's head was stained with blood, and an expended bullet was inside. A cushion of the bedroom couch also had bloodstains on it, and there was blood on the towel on Brooks's head. When Brooks was rolled over, a misfired .30-caliber M1 carbine round was found stuck to her shirt. On a shelf of the entertainment center were a computer modem and mouse, and cables indicating that a computer had been there. The kitchen trash can contained a beer can and liquor bottles.

Santos's fingerprint was found on the interior front door of the apartment. No other fingerprints at the crime scene or on any other evidence were matched to anyone. Detective Zumwalt found Brooks's cell phone in her bedroom; she had received a call from Santos at 5:56 a.m. on January 9, 2008. A custodian of records for the cell phone company testified that Santos's cell phone made a two-minute call to Brooks's cell phone at 12:40 p.m. on January 8, 2008, and made another call to Brooks's phone at 5:56 a.m. on January 9 for one minute. There were hundreds of calls made from Santos's phone to Brooks's phone before January 9.

The forensic pathologist in the coroner's office who conducted Brooks's autopsy determined that Brooks suffered multiple contusions and lacerations to the head, and she had died from a gunshot wound that entered the left back of her head, traveled upwards, and exited through the right top of her head. The wound was consistent with Brooks being shot by a rifle while on the

ground, while the shooter stood back. The marks on Brooks's body from the ligatures used to tie her hands behind her back showed that Brooks was alive when she was tied up. Toxicology tests showed Brooks had alcohol and methamphetamine in her system.[4]

*The murder weapon and stolen items*

Two or three days after Brooks's murder, Gonzalez's cousin Steven Puentes was at home in Long Beach when Gonzalez came over with Santos, whom Puentes had not met before. Puentes identified a photograph as showing Gonzalez as he appeared at the time, with his head shaved. Gonzalez carried an item about three feet long and wrapped in a towel into Puentes's bedroom, leaving it there. Gonzalez did not tell Puentes what the item was, or what he should do with it. Gonzalez then went out and brought Santos inside. She appeared to be about five feet two inches tall, and did not appear to be pregnant. Puentes, Gonzalez, and Santos sat around for about four hours, and then Gonzalez and Santos left together, saying, "we'll be back." Puentes found the item wrapped in a towel in his clothes hamper; he moved the towel and saw it was a rifle, with a magazine in it. Puentes took the rifle with him when he moved to Paramount, leaving it in the clothes hamper.

In March 2008, Detective Zumwalt recovered the rifle (wrapped in a jacket) and a magazine (wrapped in a sock) from Puentes's hamper. There were no bullets in the gun but there were bullets in the magazine.

A Los Angeles County Sheriff's firearms expert testified that the rifle, a semiautomatic .30-caliber M1 carbine, was operable. The bullets found at the scene and the expended cartridge found stuck to Brooks's body had been cycled through the M1 carbine. The shooter had fired through the towel found at the scene, from more than two feet away.

On January 12, 2008, three days after Brooks was killed, a Long Beach police officer pulled over a blue Chevrolet Cobalt for speeding and running two stop signs. Santos was the driver, and Gonzalez was the passenger. The car was impounded. Detective Zumwalt searched the car and found a computer monitor behind the front passenger seat, and under the carpet in the trunk was a computer tower registered to Brooks.

*Jailhouse informant testimony*

Roberto Andrade testified that he had been in custody in the Los Angeles County jail since April 29, 2009, and had also been in the jail from January

---

[4] A former roommate of Brooks's testified that Brooks used methamphetamine.

28, 2008, to May 2008. Andrade had been in prison about six times. He had known Gonzalez since he was about 10 or 11 years old; they grew up in the same neighborhood. Andrade was a West Side Longos member with the moniker "PeeWee"; Gonzalez was in the same gang, with the moniker "Indio." Beginning in 2007, Andrade became an informant for the Long Beach Police Department, with Officer Luke Everts as his contact. He had been paid between $5,000 and $6,000 for the information he had given, and also had received leniency in return. For his testimony in this case, he was to receive a lesser sentence on his current conviction of second degree robbery.

In March 2008, Andrade and Gonzalez shared a jail cell. Andrade knew from Officer Everts that a Black woman had been shot in Bellflower, and Gonzalez was "paranoid" because "he had shot some girl in the head in Bellflower." He told Andrade he shot the woman in the head as she was on the floor. Gonzalez had been drinking, smoking meth, and hanging out in her apartment, and the woman had asked him and others to leave after she saw the gang tattoo on Gonzalez's head. He told the rest of the group to wait in the car, and then shot the woman in the head because she was related to Insane Crips. Gonzalez told Andrade he used an M1. Gonzalez told Andrade that he had hog-tied the woman first. After he killed her, he put her in a closet and sprayed something that smelled good (Andrade said, "I guess to try to wipe down the prints") as he left the house.

Andrade testified that Gonzalez had a big Westside Longo tattoo on the back of his head. He identified a tattoo shown in exhibit 55 as similar to the tattoo on Gonzalez's head. Gonzalez told Andrade that because the Crips and the Longos were rivals, he wore a beanie to hide the tattoo so he could get into Brooks's apartment.

With the help of a friend, Andrade called Officer Everts in a three-way phone call, and Officer Everts came to the jail and pulled him out of the cell to get the information. Officer Everts wanted to know where the murder weapon was. A few days later, Andrade told Gonzalez he would have one of his friends help him get rid of the weapon, and Gonzalez gave Andrade the address where the weapon could be found. Andrade also set up three-way phone calls for Gonzalez to talk to his cousin, Puentes, and to Gonzalez's girlfriend Marisol.

Andrade had not testified before, and he was now in protective custody and was escorted everywhere, because people wanted to kill him for giving information. He would be in protective custody in prison while serving his robbery sentence. He learned none of the details of the murder from Officer Everts or anyone else, other than Gonzalez. He ran into Gumby after Officer

Everts told him about the murder, and Gumby told him "Jimmy and Sheena had went out to Bellflower and smoked some black girl."

### Recordings of jailhouse telephone calls

Marisol Maciel testified that Gonzalez had been her boyfriend for four years. In 2008, she talked to Gonzalez on the phone, knowing those calls were being recorded. An audio recording of a telephone call from Gonzalez to Maciel recorded March 11, 2008, was played to the jury. At intervals, a voice message stated: "Your call may be monitored or recorded." Gonzalez asked Maciel if she had gotten his cousin "Steven's" number for him, and Maciel gave him the number. She told him, "they gonna get rid of the puppy," and "[y]ou think he didn't know where to put the puppy though." Gonzalez said: "Tell him don't trip! Tell him that I, I, I think one of the, uh, some, some fool I know he wants to buy it. He wants a dog, eh?" Maciel testified that she could not recall what she was discussing with Gonzalez regarding his cousin and the "puppy." She admitted that she told Detective Zumwalt the "puppy" was a gun.

Puentes also testified that Gonzalez called him from jail on March 11, 2008, to talk about what Puentes was supposed to do with the rifle. A tape recording of the call was played to the jury. Puentes told Gonzalez that Puentes still had the "puppy [Gonzalez] left over there." Gonzalez told Puentes: "don't take it out fool, 'cause people, you know what I mean they'll probably steal it." A few days later, Detective Zumwalt came to Puentes's house, and Puentes gave him the gun.

The jury heard a recording of another phone call between Gonzalez and Maciel on March 18, 2008. Maciel told Gonzalez, "your cousin told me to tell you" that "[t]he little blue man" picked up "the thing." Gonzalez swore and said, "I'm not gonna see you no more, baby." He added, "Yeah, seriously, that's what they needed," and when Maciel began to cry, he said, "tell him that I bought it from another person." Gonzalez said, "I thought that I was gonna get out soon," "[i]t's already done with me, baby," and "I'm never gonna see my daughter no more." He told Maciel to call his sister and tell her what had happened. In court, Maciel explained that the "blue man" was the police, the "puppy" or gun was at Steven's house, and she did not want to be testifying.

Gonzalez had a telephone conversation from jail with his sister Claudia that same day, March 18, 2008. Claudia told him, "they just went over there, and they just took whatever [¶] . . . [¶] '[c]ause you called over there that's why. [¶] . . . [¶] You should have just left it alone. You should have just left that whatever and just worried about it when you got out." Gonzalez asked,

"didn't say that it was mine?" and Claudia responded, "No." Gonzalez continued: "All right. That a girl took it. You know what I mean? [¶] . . . [¶] And said that it was mine." Claudia responded: "Yeah." Gonzalez said, "Talk with him."

*Gang evidence*

Long Beach Police Detective Sean McGee testified that he worked with the department's gang intelligence team. The West Side Longos were enemies of the Insane Crips and the Rolling 20's Crips. The Insane Crips and the Rolling 20's Crips were also rivals, although sometimes they worked together against their common enemy the West Side Longos. The hostility between the gangs heated up in the mid-1990's, as a result of racial tension. The hostility led to shootings (including killings), fistfights, and general disrespect between the gangs. A killer of a member of an enemy gang would gain respect. On cross-examination, Detective McGee gave details of other local gangs and the conflicts between them.

Detective McGee testified that exhibit 55, the photograph of a tattoo which Andrade had testified looked like the tattoo on Gonzalez's head, was a West Side Longo gang tattoo that would signify that the wearer was a member of the gang. A handwritten note found on Santos's person had writing consistent with West Side Longo, and a person writing in that manner would be a member of the West Side Longos gang. A Pittsburgh Steelers flag was found on the floor in Brooks's living room, and the team was associated with the Rolling 20's gang. It would be expected that a West Side Longo member would help a fellow member do what was needed, for example, getting rid of evidence.

Gonzalez presented no evidence.

During deliberations, the jury requested a readback of Andrade's testimony. The jury found Gonzalez guilty of first degree murder and found true the firearm allegations. The trial court sentenced Gonzalez to 80 years to life in state prison, and imposed fines and fees.

## DISCUSSION

I.  *Section 1111.5 does not apply retroactively to Gonzalez.*

Brooks was murdered on January 9, 2008. The jury convicted Gonzalez on June 9, 2011, and the court sentenced Gonzalez on October 5, 2011. Nearly three months after Gonzalez's sentencing, on January 1, 2012, section 1111.5 became effective, providing in subdivision (a) that a jury may not convict a

defendant "based on the uncorroborated testimony of an in-custody informant," and in subdivision (b) that " 'in-custody informant' means a person . . . whose testimony is based on statements allegedly made by the defendant while both the defendant and the informant were held within a city or county jail . . . ."[5] Gonzalez argues that the new statute should apply retroactively to his conviction, which was not yet final on appeal when section 1111.5 became effective. He further argues that Andrade's testimony was not sufficiently corroborated to serve as a basis for his conviction under section 1111.5, and we should therefore reverse. We decline to apply section 1111.5 retroactively.

■ "It is well settled that a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise. [Citations.]" (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287 [279 Cal.Rptr. 592, 807 P.2d 434] (*Tapia*).) Section 3 provides: "No part of [the Penal Code] is retroactive, unless expressly so declared." The parties agree that nowhere in the text or legislative history of section 1111.5 is there any indication that section 1111.5 was an exception to the general rule and was intended to apply retroactively.

Gonzalez argues, however, that section 1111.5 benefits defendants such as him by requiring corroboration of the testimony of jailhouse informants, adding to the prosecution's burden at trial. He claims section 1111.5 therefore falls under an exception to the rule of prospectivity, as it is an ameliorative law benefitting criminal defendants.

■ In *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948] (*Estrada*) the California Supreme Court held that a statute lessening punishment is presumed to apply to all cases not yet reduced to final judgment on

---

[5] Section 1111.5 states: "(a) A jury or judge may not convict a defendant, find a special circumstance true, or use a fact in aggravation based on the uncorroborated testimony of an in-custody informant. The testimony of an in-custody informant shall be corroborated by other evidence that connects the defendant with the commission of the offense, the special circumstance, or the evidence offered in aggravation to which the in-custody informant testifies. Corroboration is not sufficient if it merely shows the commission of the offense or the special circumstance or the circumstance in aggravation. Corroboration of an in-custody informant shall not be provided by the testimony of another in-custody informant unless the party calling the in-custody informant as a witness establishes by a preponderance of the evidence that the in-custody informant has not communicated with another in-custody informant on the subject of the testimony. [¶] (b) As used in this section, 'in-custody informant' means a person, other than a codefendant, percipient witness, accomplice, or coconspirator, whose testimony is based on statements allegedly made by the defendant while both the defendant and the informant were held within a city or county jail, state penal institution, or correctional institution. Nothing in this section limits or changes the requirements for corroboration of accomplice testimony pursuant to Section 1111."

the statute's effective date: "If the amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final then, in our opinion, it, and not the old statute in effect when the prohibited act was committed, applies." (*Id.* at p. 744.) The court reasoned: " 'A legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law.' " (*Id.* at p. 745.) Thus, "[i]t is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply[,] . . . [including] acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Ibid.*) Unless the Legislature included a savings clause providing for prospective application, a statute lessening a penalty rebutted the rule that statutes are to be applied prospectively, as embodied in section 3. (*Estrada*, at p. 747; see *People v. Floyd* (2003) 31 Cal.4th 179, 184–185 [1 Cal.Rptr.3d 885, 72 P.3d 820].)

Section 1111.5, however, does not lessen or mitigate a criminal penalty for a particular crime. *Estrada, supra*, 63 Cal.2d 740, does not modify the general rule providing that a statute will not apply retroactively unless (as is *not* the case here) "it is very clear from extrinsic sources that the Legislature or the voters must have intended a retroactive application." (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1208–1209 [246 Cal.Rptr. 629, 753 P.2d 585].) "*Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*People v. Brown* (2012) 54 Cal.4th 314, 324 [142 Cal.Rptr.3d 824, 278 P.3d 1182] (*Brown*).) *Brown* rejected the defendant's argument that *Estrada* "should be understood to apply more broadly to any statute that reduces punishment in any manner," reiterating that *Estrada* applies specifically to "a statute that represents ' "a legislative mitigation of the *penalty for a particular crime.*" ' " (*Brown*, at p. 325.) It is "not . . . a logical extension of *Estrada*'s reasoning" (*ibid.*) to conclude, as Gonzalez urges, that section 1111.5, which lessens no penalty and applies to criminal prosecutions in general and not to a particular crime, is exempt from the presumption of prospective operation.

■ *Tapia, supra*, 53 Cal.3d 282 does not require a different result. In *Tapia*, the defendant had been accused of first degree murder committed in February 1989, prosecution was pending, and voir dire had yet to begin. (*Id.* at p. 286.) The trial court ruled that it would apply Proposition 115, which took effect on June 6, 1990, and required the court rather than attorneys to conduct voir dire. The defendant sought to have the court's order vacated, arguing that

the proposition should not be applied retrospectively, that is, to prosecutions of crimes committed before its effective date. (53 Cal.3d at pp. 286–287.) The California Supreme Court disagreed, concluding: "[A] law governing the conduct of trials is being applied 'prospectively' when it is applied to a trial occurring after the law's effective date, regardless of when the underlying crime was committed or the underlying cause of action arose." (*Id.* at p. 289.) It was thus permissible to apply the law in the defendant's voir dire, because applying it to a trial begun after its effective date was a prospective application " 'to the procedure to be followed in the future.' " (*Id.* at pp. 288, 289.)

▆ In contrast, Gonzalez's trial, conviction, and sentencing were all complete three months before the effective date of section 1111.5. We therefore need not determine whether the new statute requiring a change in the conduct of a criminal trial (mandatory corroboration of a jailhouse informant's testimony) might apply prospectively, consistent with section 3, to a trial that began *after* the statute's effective date.

Section 1111.5 does not require the reversal of Gonzalez's conviction.[6]

II. *The trial court did not abuse its discretion in admitting gang testimony.*

Gonzalez argues that his right to due process and a fair trial were violated when the trial court allowed gang evidence at trial, because the evidence was more prejudicial than probative. We review for an abuse of discretion whether the trial court erred in allowing gang evidence under Evidence Code section 352. (*People v. Brown* (2003) 31 Cal.4th 518, 547 [3 Cal.Rptr.3d 145, 73 P.3d 1137].)

Before trial, the prosecutor stated that although there was no gang enhancement allegation, evidence regarding gangs would be offered to explain Andrade's testimony and the motive for the murder. The defense did not object. Gonzalez's counsel objected, however, when the prosecution asked Andrade how he knew Gonzalez, and when the prosecutor asked Andrade about the relationship between the West Side Longos and the West Side

---

[6] We note that substantial portions of Andrade's testimony were corroborated (the details of Brooks's murder, the consumption of methamphetamine and alcohol, the location of the murder weapon) by other testimony, including Gonzalez's taped telephone conversations. In those conversations, Gonzalez's strong reaction to learning that the rifle had been recovered by the police is consistent with Andrade's testimony that he had used the rifle in the murder of Brooks. Further, Gonzalez's codefendant Santos's fingerprint was found on Brooks's interior door, and a man with a shaved head and a woman were seen carrying items out of Brooks's apartment just after the murder. A day or two later, Gonzalez and Santos went to Puentes's house to hide the murder weapon, and three days after the murder items taken from Brooks's apartment were found in a car driven by Santos, with Gonzalez as the passenger.

Crips. The court overruled the objections. Gonzalez later joined in Santos's motion to exclude "[a]ny, and all 'gang type evidence' " (including the testimony of a gang expert) as irrelevant and unduly prejudicial under Evidence Code section 352. The trial court initially struck Andrade's testimony that the murder of Brooks was " 'I guess retaliate a gang thing' " as merely Andrade's supposition, but otherwise ruled that the gang evidence was relevant to the prosecution's theory that Gonzalez killed Brooks because she was a member of a rival gang.[7] Subsequently, the court withdrew its striking of Andrade's statement about retaliation, given that the defense would argue that Andrade was merely guessing. Gonzalez's attorney moved to exclude all the gang evidence, and the court denied the motion, stating that the evidence was admissible to prove more than mere gang activity: "This evidence comes in as part of the whole act, the whole res gestae. . . . [¶] I agree with you that it has a clear tendency to paint Mr. Gonzalez in a bad way, but the evidence is otherwise admissible. Therefore, the taint is outweighed by the probative value." The court later clarified that the prosecutor could not use Andrade's testimony in questioning the gang expert, who "is merely going to talk about the history of the rivalry between the Rolling 20[']s Crips and West Side Longos. That's all he is going to be testifying about." The court urged defense counsel to object to any improper questions. The jury was instructed that the gang evidence could be considered only for the limited purpose of deciding whether Gonzalez had a motive to kill Brooks.

■ "[A]dmission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." (*People v. Williams* (1997) 16 Cal.4th 153, 193 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Evidence of gang membership in a case not involving a gang enhancement is potentially prejudicial and "should not be admitted if its probative value is minimal. [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223 [57 Cal.Rptr.3d 92].) Nevertheless, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [16 Cal.Rptr.3d 880, 94 P.3d 1080].)

The gang evidence was probative of Gonzalez's motive for shooting and killing Brooks. The prosecution's theory was Gonzalez, a Longo, gained entrance to Brooks's apartment through fellow Longo member Santos, and

---

[7] The court noted that the gang evidence, including the testimony of the gang expert, would not be heard by the Santos jury.

murdered Brooks because she was a member of a rival Crips gang, the Rolling 20's. The evidence that Gonzalez was a member of the Longos, and that his gang had a rivalry with the Crips, was highly relevant. "Defendant argues even if gang membership evidence was relevant, its probative value was outweighed by its prejudicial effect. We do ,not agree. The gang evidence . . . in this case was of more than minimal probative value. It tended to establish, among other things, that the victim appeared to be a member of a gang which was a deadly rival of defendant's gang. [Citation.] Nor does defendant argue the gang membership evidence was cumulative to other evidence of motive presented to the jury. [Citation.]" (*People v. Williams, supra,* 16 Cal.4th at p. 194.)

The trial court did not abuse its discretion in allowing gang evidence.

III. *The postverdict rulings did not violate Gonzalez's constitutional rights.*

Gonzalez argues that under *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*) the trial court violated due process and denied him effective counsel in its rulings relieving his trial counsel and denying counsel's reinstatement. We disagree.

*Gonzalez's waiver of counsel was not ineffective.*

After his conviction, on July 26, 2011, Gonzalez appeared with his appointed trial counsel, who reported that the prosecution (who waived appearance) had agreed to continue the sentencing hearing to August 10, 2011. The court continued the hearing to August 10, 2011. Gonzalez then asked to speak with the judge, and stated that he had "a motion . . . to file." Counsel stated that he had read the two-page handwritten motion and said: "I suppose it could be a *Marsden* matter. He's complaining about my conduct." The court read the motion on the bench and ordered it filed.

The motion stated: "I will [*sic*] like to go pro per for my sentencing and for a retrial motion." Gonzalez stated that his Sixth Amendment right to counsel was violated because trial counsel never interviewed any witnesses, never discussed the case with Gonzalez, failed to obtain a promised gun expert, never sent an investigator to the scene, did not check the gun for prints, and did not call two witnesses. The motion did not ask for new counsel, but concluded: "I also had hearings on Mr. Newton base [*sic*] on the same issue that I'm [*sic*] address today at court." This is an apparent reference to events before trial, when Gonzalez stated: "I want a *Marsden*" in court on February 23, 2011, and again on March 22, 2011. The trial court held a *Marsden* hearing on February 23 and March 22, when it denied Gonzalez's motion to substitute counsel.

The court asked: "Well, you're kind of saying two different things. [¶] Did you want to go pro se? Do you want to represent yourself? . . . Is that what you're asking me?" Gonzalez answered: "Yeah, to file some motions." The court asked: "Well, I'm just asking. Are you asking to go pro per?" Gonzalez said: "Yes, sir." The court gave Gonzalez a form to fill out, telling counsel: "Because I have to go through the waivers with him. And if you're relieved we'll notice you." Counsel responded: "I understand. I'll be out in the hallway. [¶] I would ask the court to consider, in my opinion, there are a couple of motions that are—that I've done some research on that I intended to file before the P[robation] and S[entence] that are rather unique." The court responded that he could discuss that with Gonzalez, "[b]ut as of right now he's requested to go pro per and the court must deal with that."

When Gonzalez returned after a recess (with counsel absent), the trial court asked him about his education and work experience (Gonzalez went to high school in juvenile hall, but did not graduate). Gonzalez asked: "Your honor, if you don't grant the pro per could I get another lawyer to represent me?" The court responded: "Well, you or your family can hire a lawyer any time you want if you're able to, but I can't appoint—under the court rules the lawyer that's been appointed for you is your lawyer. So I can't appoint a different lawyer than [counsel]." An audience member asked, "But the family can?" the court responded yes, and the audience member responded, "That's what we'll do." The court continued by asking Gonzalez if he understood his rights and the consequences of self-representation, noting that now would be the time to file a motion for new trial. Gonzalez agreed that he still wanted to waive his right to an attorney. The court granted Gonzalez propria persona status, repeating that the family could hire an attorney if they wanted to. The court added: "If you want any pro per funds you'll have to make a motion because right now I don't see any need for any, so make a little motion telling me what you need and everything," authorizing $25 for supplies. Gonzalez requested $175 for ancillary "funds for the preparation of his defense for retrial" on August 10, 2011. The court granted him $15.

The matter was continued to October 4, 2011, for a court trial on Gonzalez's prior convictions, and on that date Gonzalez filed a motion for between $175 and $250 for phone and supply costs, and for the appointment of an investigator to assist him in preparing for a new trial. At the hearing on that date, the court excused the prosecutor to conduct an ex parte hearing. The court asked Gonzalez why he needed funds and an investigator: "There's no showing for why you need this. This is a priors trial. You haven't given me any showing why I should appoint an investigator, why you need more money." Gonzalez replied that he needed the money to contact witnesses, and needed the investigator "to investigate the investigator that [counsel] had and things that [counsel] didn't do for me." The court denied the motion without prejudice, noting, "It's post trial. You have not laid any foundation or facts as

to what, if anything, is out there could be discovered or why it wasn't discovered earlier," and explaining that Gonzalez needed to "make some kind of a showing as to why you need an investigator post trial." Gonzalez responded that he wanted an investigator to interview his "witnesses and alibis" and the investigator at trial. The court denied the motion with prejudice.

Gonzalez requested a continuance because he still needed to get his trial transcripts. The court denied the request, and with the prosecutor present, the trial on the priors began. The court signed a medical order for Gonzalez to obtain a liver examination, at his request. The court then found the prior true, and again denied Gonzalez's request for transcripts and minute orders.

At the sentencing hearing the next day, October 5, 2011, the court stated that "it denied the continuances of Mr. Gonzalez [because] he's been in pro per for a substantial period of time, and all he's asked for is money for personal use and he's indicated over and over again he needs more time, he needs more time, but yet nothing is []ever constructively done. At this time being almost three months since he was in pro per, the court finds his tactics are dilatory in nature and not in good faith." Gonzalez then stated, "I no longer—I don't want to represent myself. If I could have an attorney present. Can I get an attorney?" The court concluded this was "another dilatory tactic. You chose to go pro per. This is sentencing. There's nothing to be done except the actual act of sentencing. That request is denied." The victim's family was in the courtroom, and "this is another dilatory, delaying tactic to disrupt the proceedings." Gonzalez stated: "I don't understand what is going to be going on." The court answered: "You were told about all that when you decided to represent yourself." Gonzalez responded: "I no longer want to represent myself," and the court rejoined: "I understand. Very well. That request is denied. You choose [*sic*] to go pro per." The court heard victim impact statements, Gonzalez addressed the family (claiming innocence), and the court sentenced Gonzalez.

Gonzalez first argues that he did not effectively waive his right to counsel under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*). He contends that his request to go pro per was "a hybrid *Marsden/Faretta* motion," and that the court should therefore have addressed not only the *Faretta* factors, but should also have conducted a hearing as provided for by *Marsden, supra,* 2 Cal.3d 118.

■ When a defendant claims ineffective representation by appointed counsel and asks the court to substitute another appointed attorney, the trial court must allow the defendant to explain his request and state specific reasons why current counsel is not providing adequate representation.

(*Marsden, supra*, 2 Cal.3d at p. 124.) The defendant, however, must give " 'at least some clear indication . . . that he wants a substitute attorney.' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 157 [99 Cal.Rptr.2d 485, 6 P.3d 150]; see *People v. Sanchez* (2011) 53 Cal.4th 80, 89–90 [133 Cal.Rptr.3d 564, 264 P.3d 349].) A defendant is entitled to a substitute appointed lawyer if, during an ensuing *Marsden* hearing, he "makes a showing . . . that his right to counsel has been ' " 'substantially impaired.' " ' " (*Sanchez*, at p. 90.)

There was no clear indication that Gonzalez was requesting a substitute appointed attorney so as to require the court to conduct a *Marsden* hearing. Gonzalez's motion stated: "I will [*sic*] like to go pro per . . . ," and did not request a different appointed attorney. Gonzalez responded yes to the court's question whether he wanted to represent himself. Gonzalez was aware of his entitlement to a hearing if he desired to substitute counsel; he had twice explicitly demanded a *Marsden* hearing before trial, and the court held a hearing on two court dates before denying the motion. Gonzalez also expressed his preference for self-representation by asking whether, if "you don't grant the pro per" his family could hire another lawyer, indicating that would be his second choice.[8] The court did not have a duty to conduct another *Marsden* hearing. (*People v. Burton* (1989) 48 Cal.3d 843, 855–856 [258 Cal.Rptr. 184, 771 P.2d 1270].)

*People v. Cruz* (1978) 83 Cal.App.3d 308 [147 Cal.Rptr. 740], does not require a different result. In that case, the court granted the defendant's request to represent himself, made before jury selection and trial. The defendant claimed a conflict with the entire public defender's office based on past experiences in other cases, stating that he believed no one in the office could properly represent him. (*Id.* at pp. 313, 317.) The court's "failure to fully explore defendant's charges" reinforced this belief and led to an ineffective waiver of counsel. (*Id.* at p. 318.) No such general conflict was involved here, and the trial court had conducted a *Marsden* hearing before trial. In *People v. Hill* (1983) 148 Cal.App.3d 744 [196 Cal.Rptr. 382], the defendant had already had several substitutions of appointed attorneys before trial. After he submitted a motion for self-representation, he repeatedly stated that he did not actually wish to represent himself, but did not have confidence in his current attorney, and would only represent himself if the court did not appoint different counsel. (*Id.* at pp. 750–751.) During jury selection, the defendant sought to withdraw his *Faretta, supra*, 422 U.S. 806

---

[8] The court stated: "I can't appoint—under the court rules the lawyer that's been appointed for you is your lawyer. So I can't appoint a different lawyer than [counsel]." Of course, the court could have appointed another lawyer had Gonzalez asked for substituted counsel rather than self-representation and made an adequate showing in a *Marsden* hearing. In the context of the hearing and given Gonzalez's prior *Marsden* requests, however, the parties were clearly aware that this procedure was available, and we do not interpret this statement as telling Gonzalez the court was without power to substitute counsel.

waiver and requested the reinstatement of appointed counsel, which the trial court denied. (*Hill*, at p. 752.) The "domino sequence of events" resulted in a denial of effective assistance of counsel and made the *Faretta* waiver ineffective. (*Hill*, at p. 762.) By contrast, Gonzalez clearly expressed his preference for self-representation over the appointment of substitute counsel.

The failure to conduct a *Marsden* hearing did not render ineffective Gonzalez's waiver of counsel under *Faretta*.

> *The court did not abuse its discretion in refusing to grant a continuance.*

■ Gonzalez argues that the trial court abused its discretion in not allowing him a continuance on October 4, 2011, the date set for court trial on his priors. While the court must not deprive the defendant of a " 'reasonable opportunity to prepare' " (*People v. Jackson* (2009) 45 Cal.4th 662, 678 [88 Cal.Rptr.3d 558, 199 P.3d 1098]), only an unreasonable ruling is an abuse of discretion, and the burden to establish such an abuse is on Gonzalez. (*People v. Beames* (2007) 40 Cal.4th 907, 920 [55 Cal.Rptr.3d 865, 153 P.3d 955].) We look to " ' "the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." [Citations.]' " (*People v. D'Arcy* (2010) 48 Cal.4th 257, 288 [106 Cal.Rptr.3d 459, 226 P.3d 949].) "[A]n order denying a continuance is seldom successfully attacked. [Citation.]" (*Beames*, at p. 920.)

The court first denied Gonzalez's motion for an investigator "TO ASSIST IN THE PREPARATION OF A DEFENSE" in the event of a new trial, because he had made no showing why he needed one "at this late date after the trial." Gonzalez then requested a continuance (without any specific amount of time) "because [he] still need[ed] to get [his] trial transcripts, still need[ed] to work on [his] stuff." Noting that he had been representing himself since July, the court denied the continuance and proceeded with the priors trial.[9] The next day at sentencing, the court added that during the three months he had been self-representing, Gonzalez had asked for money and more time "but yet nothing is never [*sic*] constructively done," and concluded "his tactics are dilatory . . . and not in good faith."

The trial court did not abuse its discretion in refusing to grant a continuance on October 4, 2011. Although on appeal Gonzalez indicates that he needed more time to prepare a motion for new trial, on October 4, the date set for the court trial of his priors, he stated only that he needed his trial

___

[9] The court also denied Gonzalez's request for a medical continuance, but signed a medical order for Gonzalez to see a doctor for his liver.

transcripts and "still need[ed] to work on [his] stuff," without further explanation or specifics. The trial court was not unreasonable in concluding that Gonzalez's request was for purposes of delay and denying the request for continuance.

*The court did not abuse its discretion in denying the request to reappoint counsel.*

Gonzalez also argues it was an abuse of discretion to deny Gonzalez's request to reappoint counsel at the sentencing hearing on October 5, 2011, immediately after the court explained why it had denied him a continuance the day before. In considering whether to grant a defendant's request to withdraw from self-representation and have counsel appointed, we consider the " 'totality of the facts and circumstances,' " including defendant's prior history in substitution of counsel, the reasons for the request, the stage of the trial proceedings, the disruption that might ensue, and the likelihood of defendant's ability to defend against the charges if he proceeded in propria persona. (*People v. Gallego* (1990) 52 Cal.3d 115, 164 [276 Cal.Rptr. 679, 802 P.2d 169].) The trial court need not review on the record each factor: "The standard is whether the court's decision was an abuse of its discretion under the totality of the circumstances . . . ." (*People v. Lawrence* (2009) 46 Cal.4th 186, 196 [92 Cal.Rptr.3d 613, 205 P.3d 1062].)

Gonzalez asked, "Can I get an attorney?" the day after his request for continuance was denied and on the day of sentencing. When the court denied the request, he said, "I don't understand what is going to be going on," and the court responded, "You were told about all that when you decided to represent yourself."

Gonzalez had requested substitution of counsel before trial and had had a *Marsden* hearing; he had requested, had been advised of the consequences of, and had been granted self-representation following his conviction; he stated as a reason for reappointment of counsel that he didn't understand what would go on at sentencing; he requested reappointment of counsel during the sentencing hearing, with the family of the victim present; and Gonzalez's ability to defend against the charges was not implicated, as he had been represented by appointed counsel throughout his trial. "That defendant was told of—and affirmed his understanding of—the risks and disadvantages of self-representation before he waived counsel reflected on his reasons for later seeking to revoke the waiver." (*People v. Lawrence, supra,* 46 Cal.4th at p. 195.) Considering the totality of circumstances, it was not an abuse of discretion not to reappoint counsel. In any event, Gonzalez has not demonstrated that reappointment of counsel during the sentencing hearing might have benefitted him. He argues only "it is not beyond the bounds of reason"

to expect that reappointed counsel would have filed, and the court would have granted, a motion under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628], to strike his strike prior. This does not demonstrate that a result more favorable to Gonzalez was reasonably probable if the trial court had reappointed counsel. (See *People v. Ngaue* (1991) 229 Cal.App.3d 1115, 1126–1127 [280 Cal.Rptr. 757].)

IV. *The court's minute order should be corrected to reflect the oral pronouncement of judgment.*

Gonzalez argues, and respondent agrees, that the minute order on the priors trial should be corrected.

At the court trial on the priors, the court stated: "I have an abstract of judgment, prison commitment case No. NA064097 from February 15, 2005, showing a conviction for terrorist threats." The prosecutor replied: "That's all I have for the priors trial, so once I have that marked and moved into evidence I will rest." The court then stated: "I'm finding the prior strike true," referring to the abstract of judgment received into evidence.

The minute order for October 4, 2011, correctly reflects that case No. NA064097 qualified as a strike conviction under section 667, subdivision (a)(1). The minute order incorrectly states, however, that two other cases, Nos. NA056813 and VA091647,[10] qualified as strike convictions, serious felonies (§ 667, subd. (a)(1)) and prior prison term convictions under section 667.5, subdivision (b), and that case No. NA064097 also qualified as a prior prison term conviction. This does not reflect the trial court's oral pronouncement, which included only case No. NA064097 qualifying as a prior strike but not as a prior prison term conviction.

Conflicts between oral pronouncement of judgment and the minute order are presumed clerical, and generally are resolved in favor of the oral pronouncement. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [109 Cal.Rptr.2d 303, 26 P.3d 1040].) We therefore order correction of the minute order to reflect the court's oral pronouncement of judgment as reflected in the reporter's transcript.

### DISPOSITION

The trial court is ordered to correct the October 4, 2001 minute order to delete all references to cases Nos. NA056813 and VA091647, and to delete

[10] These cases were apparently included in the packet containing case No. NA064097.

the reference to Penal Code section 667.5, subdivision (b), as to case No. NA064097. In all other respects, the judgment is affirmed.

Rothschild, Acting P. J., and Chaney, J., concurred.

On November 15, 2012, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 30, 2013, S206750.