Filed 9/4/15  P. v. Haro CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DANIEL HARO, <br><br> Defendant and Appellant. | D065742 <br><br><br> (Super. Ct. No. SCD243126) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael T. Smyth, Judge.  Affirmed.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Alana C. Butler, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Daniel Haro of first degree murder (Pen. Code,[1] § 187, subd. (a)), and attempted murder (§ 187, subd. (a), 664). Haro admitted having a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12), a prior serious felony conviction (§ 667, subd. (a)(1)), and two prior prison commitment convictions (§ 667.5, subd. (b)). The trial court sentenced him to a total prison term of 30 years plus 50 years to life.[2]

Haro appeals, contending the trial court prejudicially erred in allowing the People to admit gang evidence. He also contends there is insufficient evidence of premeditation and deliberation to support his first degree murder conviction. We are not persuaded by either contention and affirm the judgment.

BACKGROUND

*Prosecution Evidence*

The victim was staying at a flophouse along with Mirasol Sua, Daniel Gonzalez, and Gonzalez's girlfriend, Amanda Sena.[3] On the night of the victim's murder, Haro went to the flophouse. Gonzalez, Sena, and the victim were there. Sua arrived a little later. By then, a man named Tony was also there.

---

[1]     Further statutory references are also to the Penal Code unless otherwise stated.

[2]     Haro declined an eve of trial offer from the prosecutor for him to plead guilty to voluntary manslaughter and admit having a prior serious felony and a prior strike conviction in exchange for a 27-year determinate prison sentence.

[3]     As used at trial, "flophouse" meant a house where drug users went to hang out, use drugs and sleep.

2

Haro was acting strangely. He had his hand in his T-shirt and was using it like a glove to hold his cell phone. In addition, he was not talking or responding to attempts to engage him in conversation. Instead, he would stare at people, stop moving, then snap out of it. At one point, he started touching Gonzalez's face. Gonzalez asked him if he was okay and he said he was fine, but he seemed confused.

Shortly after Sua arrived, Gonzalez and Sena left. Sua went into the living room, sat in a chair, and smoked some marijuana. Tony was also sitting in the living room. A few minutes later, Haro came into the living room. He was holding a strip of fabric sheeting tautly in his hands and wringing it.

Sua has known Haro for years and had sex with him once. She frequently ran into him at the flophouse. When he came into the living room, she offered him some marijuana, but he did not respond to her. She got up to use the bathroom and he blocked her with his arm and leg. She asked him to move. He looked at her, then to Tony, and asked Tony, "You won't say nothing, right?" Tony shook his head.

Sua told Haro to get out of the way and went around him. She went into the back bedroom and locked it. She never saw Tony in the flophouse after that. Meanwhile, she sent Amir Abdelnur, who was her lover and the victim's best friend, a text message asking him to bring her purse, which she had left in his car earlier in the day. She unlocked the back bedroom door after the victim retrieved her purse from Abdelnur and brought it to her.

As she was in the back bedroom using her cell phone to arrange a methamphetamine purchase, Haro came in and told her she was "red flagged" and could

3

not smoke methamphetamine anymore. He also told her to "stop fucking around" and acting like a "ho." His remarks made no sense to her because she had never heard the phrase "red flag" before and she injected, rather than smoked, methamphetamine. She asked him what he was talking about and she laughed it off. He then came toward her determinedly, wrapped the strip of sheeting tightly around her neck, and started choking her to the point she could not breathe. They fell to the ground as she tried unsuccessfully to fight back.

The victim, who is much smaller than Haro, passed by and pulled Haro off of Sua. Haro kept staring at Sua and did not acknowledge the victim's presence. The victim told Sua to leave the flophouse. She wanted the victim to come with her, but he did not.

Sua ran from the flophouse to her cousin's house. Sena and Ray Valdez were there. Sua frantically told them Haro had tried to kill her and she was worried about the victim because he had helped her and stayed behind. Because she had lost her cell phone while struggling with Haro and left it behind when she fled the flophouse, she borrowed Valdez's cell phone and tried to call the victim, but the victim never responded. She also spoke with Abdelnur, telling him Haro had "tripped out" and asking him to check on the victim.

When Abdelnur went to the flophouse to check on the victim, he found the victim on the floor between the dining room and the living room. The victim had dark bruises around his neck and the knuckles on his left hand were bruised and bleeding. Although Abdelnur testified he did not see anyone else in the house, he previously told Sua that, when he arrived, Haro was moving the victim and furniture around and was wiping the

4

victim's face and neck. When Abdelnur could not rouse the victim, he called Gonzalez.[4]
He then called 911.

While Abdelnur was on the phone with the 911 operator, Gonzalez came into the flophouse, saw the victim, became upset, and demanded to know what happened. At some point before the police arrived, Gonzalez left the house.

Gonzalez went to Sua's cousin's house. Like Sua, he was frantic when he arrived. He went straight to Sena and told her they had to go. Sua told him what happened to her and he invited her to go with them. She kept asking to check on the victim and, although Gonzalez did not respond to her request, she thought that was what they were going to do. They drove by the flophouse and saw a lot of police activity there. After Sua kept asking what happened and to check on the victim, Gonzalez turned around and, crying, told her, "He killed him. He's dead."

Gonzalez told Sena that, when he arrived at the flophouse, Abdulner was calling the police and Haro was standing in the living room. Gonzalez screamed at Haro, asking him what happened. Haro said he did not know.

Since Gonzalez and Sena had been living at the flophouse, they knew they would have to speak with the police. Sua told them not to mention her because she learned "in

---

4    The prosecutor originally charged Gonzalez with the victim's murder along with Haro. However, the prosecutor dismissed the murder charge against Gonzalez after preliminary hearing testimony indicated Gonzalez had no role in the murder. The prosecutor instead charged Gonzalez with and he later pleaded guilty to being an accessory (§ 32). He refused to testify at trial even after the court granted him use immunity and jailed him for contempt.

5

the streets" speaking with police was "out of protocol." When the police first interviewed her a little less than two weeks after the incident, she did not tell the truth and hid the fabric burn marks on the sides of her neck. By then, she had also deleted cell phone photographs of the burn marks she had taken the day after the incident. She continued to be uncooperative until the police interviewed her a second time about a month later. In the midst of the second interview, she realized the police knew Haro's identity and already suspected him. She also felt she owed the victim's family some peace because he had saved her life.

The medical examiner determined the victim died from homicide caused by ligature strangulation possibly lasting 10 minutes. The victim had alcohol, methamphetamine, and marijuana in his blood system at the time of death.

Haro's DNA matched DNA found in a bloodstain on the left sleeve of the victim's outer shirt. Haro was also included as a possible contributor to DNA found in a bloodstain on the right chest area of the victim's undershirt.

*Defense Evidence*

An addiction psychiatrist testified methamphetamine overstimulation typically lasts four to six hours after methamphetamine use and can cause severe psychosis, confusion, visual distortions, reality distortions, and suggestibility. Prolonged methamphetamine addiction worsens methamphetamine psychosis. Methamphetamine psychosis can cause high anxiety and lead to violent and unpredictable behavior. Symptoms of methamphetamine psychosis include agitation and catatonia.

6

Gonzalez was a possible mid-level contributor to DNA found on the victim's neck, a possible major contributor to DNA found on the shoulder of the victim's outer shirt, and a possible major contributor to DNA found under the victim's right hand fingernails. Haro was excluded as a possible contributor to DNA found on the victim's neck, excluded as a possible minor contributor to DNA found on the victim's right hand knuckles, and excluded as a possible minor contributor to DNA found on the shoulder of the victim's outer shirt.

DISCUSSION

I

*Gang Evidence*

A

1

Except for Sena, most of the people who stayed at or frequented the flophouse were affiliated with the East Side criminal street gang. The victim was a gang member and Haro was an associate. Sua, Abdelnur, Gonzalez, and Haro's brother in law, Roman Rios, were also associates. Sena, Sua, Abdelnur, Gonzalez, and Rios lied or were otherwise uncooperative during the police investigation. Gonzalez and Rios were uncooperative at their own peril as they were wrongly charged with participating in the victim's murder even though they had exonerating alibis.[5] Gonzalez was jailed for

_____

[5] Gonzalez was charged with the victim's murder after DNA consistent with his was found on the victim's ligature wound and outer shirt as well as underneath the victim's

7

contempt and remained in custody throughout the evidentiary portion of the trial because he refused a court order to testify even after he received a grant of use immunity. (See fn. 4, *ante*.)

2

Before trial, the prosecution filed a motion seeking to admit limited gang expert testimony "regarding the reluctance of gang affiliated witnesses to provide information to police in criminal investigations." The motion also sought to admit limited gang expert testimony "explaining the purpose of a graffiti roster and its significance in establishing a relationship between a particular person, the location of the graffiti, and the people who frequent that location." Haro objected to admission of the evidence on the ground its admission was precluded by Evidence Code section 352 because it was more prejudicial than probative.[6]

The court granted the motion, limiting the evidence to: general information about gang membership, the description and meaning of a roster, and the meaning of the roster graffiti in the flophouse. The court explained the average juror does not commonly understand the relationship among gang members and its "effect on [a] person's

right hand fingernails. Evidence later revealed Gonzalez was not present at the flophouse at the time of the victim's death.

Rios was charged with the victim's murder after his fresh blood was found at the flophouse. Evidence later revealed he had gotten into an unrelated fight at the flophouse and was being treated in an emergency room at the time of the victim's death.

[6] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

interaction with police or willingness to provide accurate truthful information, willingness to talk to law enforcement in the first place, willingness to testify truthfully, or willingness to testify falsely. [¶] It also, I think, demonstrates a much stronger bias in favor of [Haro] who is, assuming there's evidence that he's affiliated with or an actual member of … the gang, I think it provides a much stronger basis for willingness to provide false information, testify falsely, or to withhold information when you're in court or with law enforcement. It's strong evidence … I think much stronger than just these bonds they have through friendship and drug use."

3

At trial, the gang expert testified a roster is a list of gang members who are hanging out together. One of rosters graffitied inside the flophouse listed Haro, Abdelnur, and the victim. The presence of the roster at the flophouse showed the three men frequented the house.

The gang expert also testified gang members typically do not like police, and the flophouse had several graffiti reflecting anti-police sentiments. The gang expert similarly testified gang members are disinclined to cooperate with police investigations. Cooperating with police reflects poorly on the gang and on the cooperating gang members. Some Hispanic gangs, including a subset of the East Side gang, even have bylaws prohibiting cooperation with police. Gang members who cooperate in a police investigation or testify in a criminal case against other gang members face repercussions for themselves and their family members.

9

Before deliberations, the court, using a tailored version of CALCRIM No. 1403, instructed the jury, "Regarding the evidence regarding gangs. You may consider evidence of gang activity or gang involvement … only for the limited purpose of evaluating: 1, a person's motivation to provide false information to law enforcement; 2, the existence of relationships between parties and the nature of those relationships; 3, a possible bias in providing testimony at trial or a prior related hearing; 4, a possible motivation for refusing to testify at trial; 5, a connection of an individual to a location; 6, the credibility or believability of a witness; and 7, the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that [Haro] is a person of bad character or that he has a disposition to commit crime."

B

Haro contends the court prejudicially erred in admitting the gang evidence because the evidence was irrelevant to any material issue in the case and its admission and scope was so prejudicial it violated Haro's right to due process of law by rendering the trial fundamentally unfair. We review the trial court's ruling for abuse of discretion. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1434.) We may not disturb the trial court's ruling unless it exceeds the bounds of reason. (*People v. Montes* (2014) 58 Cal.4th 809, 859 (*Montes*).)

" '[A]dmission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is

therefore guilty of the offense charged.' [Citation.] Evidence of gang membership in a case not involving a gang enhancement is potentially prejudicial and 'should not be admitted if its probative value is minimal.' " (*People v. Gonzalez* (2012) 210 Cal.App.4th 724, 737.) However, " 'nothing bars evidence of gang affiliation that is directly relevant to a material issue.' " (*Montes*, *supra*, 58 Cal.4th at p. 859.)

The credibility of the witnesses who stayed at or frequented the flophouse, particularly Sua and Sena, was a material issue in this case. These witnesses intentionally hindered the police investigation by providing false, incomplete, or inconsistent statements. They did this even though they apparently held the victim in high esteem. Sua did this even though the victim saved her life. Gonzalez and Rios did this even though they risked being wrongly prosecuted for the victim's murder. As the People point out and the trial court recognized, going to such extreme lengths to avoid implicating someone cannot be adequately explained without some understanding of gang culture. Thus, the gang evidence was highly relevant to the flophouse witnesses' credibility and biases. (See *United States v. Abel* (1984) 469 U.S. 45, 49 [evidence of gang membership is admissible to show potential bias].)

Moreover, the probative value of the gang evidence was not substantially outweighed by the risk of undue prejudice. The trial court was required to carefully scrutinize the evidence before admitting it. (*Montes*, *supra*, 58 Cal.4th at p. 859.) The record shows the trial court did this and reasonably concluded limited gang evidence should be admitted. The trial court lessened the prejudicial impact of the evidence by appropriately instructing the jury on the limited use of the evidence. We presume the

11

jury followed this instruction (*People v. Chism* (2014) 58 Cal.4th 1266, 1299), and Haro has not rebutted this presumption. The flophouse witnesses shared any general stigma connected with gang affiliation. In addition, the jury deliberated several days and specifically scrutinized Sua's prior statements to police before reaching its verdict, indicating it did not rush to judgment and convict Haro simply because of his gang affiliation. "Because the gang evidence was highly probative in this case, and the trial court gave a limiting instruction designed to lessen the risk of undue prejudice, we cannot say the trial court's decision to allow the gang affiliation evidence exceeded the bounds of reason." (*Montes*, *supra*, 58 Cal.4th at p. 860.)

II

*Evidence of Premeditation and Deliberation*

Haro also contends there is insufficient evidence to support his first degree murder conviction because there was insufficient evidence to support the jury's finding the victim's murder was deliberate and premeditated. " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence–that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1289-1290, italics omitted.)

12

First degree murder includes any willful, deliberate and premeditated killing. (§ 189.)  "In this context, ' "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*People v. Jennings* (2010) 50 Cal.4th 616, 645.)  " ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse."  [Citation.]  A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but "[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation." ' "  (*People v. Burney* (2009) 47 Cal.4th 203, 235; accord, *People v. Brady* (2010) 50 Cal.4th 547, 561-562.)

In this case, a jury could reasonably infer Haro had a motive to kill the victim, specifically revenge against the victim for interrupting Haro's attempt to strangle Sua. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1238; *People v. Martinez* (1987) 193 Cal.App.3d 364, 370-371.)  A jury could also reasonably infer Haro had a preconceived design to kill from the manner of the victim's death.  " 'Ligature strangulation is in its nature a deliberate act.'  [Citation.]  This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act.  'A rational finder of fact could infer that [this manner of killing] demonstrated a deliberate plan to kill [the

13

victim].' "  (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020.)  As there is substantial evidence of a motive to kill and a preconceived design to kill, we conclude there is substantial evidence of premeditation and deliberation.  (*People v. Young* (2005) 34 Cal.4th 1149, 1183 [a reviewing court will sustain a first degree murder conviction where there is evidence of a motive to kill along with evidence of either planning or a manner of killing indicating a preconceived design to kill]; *People v. Edwards* (1991) 54 Cal.3d 787, 813-814 [same]; but see *People v. Memro* (1995) 11 Cal.4th 786, 863-864 [method of killing may be sufficient by itself to support a finding of premeditation and deliberation].)

## DISPOSITION

The judgment is affirmed.


MCCONNELL, P. J.

WE CONCUR:


MCDONALD, J.


O'ROURKE, J.


14