Filed 10/18/23  In re P.P. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re P.P., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT, Plaintiff and Respondent, v. P.S., Defendant and Appellant. | A167129 (Solano County Super. Ct. No. J45631) |

In these dependency proceedings, P.S. (mother) appeals from jurisdictional findings and dispositional orders concluding that her young son P.P. (born November 2020) was described by Welfare and Institutions Code[1] section 300, subdivision (b), adjudging him a juvenile court dependent, and removing him from her care.  Mother asserts on appeal that the juvenile court erred both by denying her a proper hearing under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) before relieving her appointed attorney and by permitting her to represent herself at the combined jurisdictional and

_____

[1] All section references are to the Welfare and Institutions Code unless otherwise specified.

1

dispositional hearing. She also claims that the juvenile court's dispositional removal order was not adequately supported by the evidence. We affirm.

## I. BACKGROUND[2]

### A. *Pre-Petition Matters*

Mother has two older children, K.S. and L.P. In March 2003, a reporting party informed child welfare in Placer County that mother was breastfeeding baby K.S. while on drugs. In April 2003, a reporting party stated that she witnessed mother snorting methamphetamines while K.S. was in the home. From March 2003 to July 2003, voluntary family maintenance services were provided by Placer County due to mother's use of methamphetamines. Mother made "great progress" in an outpatient program, and the family stabilized.

In November 2020, the Solano County Health and Social Services Department (Department) received a referral that mother had tested positive for methamphetamines and tetrahydrocannabinol (THC) at the time of P.P.'s birth. The minor reportedly had a fever and respiratory issues as a result of mother's drug use. Mother left the hospital with P.P. against medical advice.

In August 2022, the Department received a referral reporting that mother brought 22-month-old P.P. to the emergency room, concerned that he had possibly ingested methamphetamines. An initial toxicology screen on the minor was presumptively positive for methamphetamines. When police officers interviewed mother at the hospital, she reported she had been

___

[2] The presumed father in this case, C.P. (father), also appealed from the jurisdictional findings and dispositional orders. However, after father's appellate attorney filed a no issues statement pursuant to *In re Sade C.* (1996) 13 Cal.4th 952 and *In re Pheonix H.* (2009) 47 Cal.4th 835, we dismissed father's appeal on June 13, 2023. Under these circumstances, we discuss father only to the extent relevant to mother's claims.

staying with the paternal grandparents because she had no other housing. She took a nap that afternoon, leaving P.P. in the care of father and the paternal grandparents. After she fed and bathed the minor, she noticed he was " 'restless and jittery' " and not acting like himself. Mother reported being worried that P.P. might have swallowed one of the grandparent's pills as they were always leaving the bottles open. One of the police officer's opined that mother was not being forthcoming, because she was inconsistent in her story and denied methamphetamine usage, even though she was a "known 'drug user.' " When asked if she would test clean that day, mother responded: " 'I think so.' " Officers went to the family home in an attempt to locate father and took pictures of the " 'filthy' " conditions they found there.

When a social worker interviewed her at the hospital, mother reported that she had been clean from methamphetamines for 12 to 13 years. She then relapsed in 2017 and had been using the drug on and off until April 2020, when she discovered she was pregnant. Mother had gone to the hospital herself the morning of the incident with the minor due to pain, leaving P.P. with father. Mother reported leaving the hospital without being discharged because hospitals make her anxious and she suffers from post-traumatic stress disorder (PTSD) and anxiety. When she told father P.P. was " 'acting weird' " that evening, father stated he did not know why. Mother was concerned at that point that the minor might have ingested one of the paternal grandfather's pills because he was recovering from a stroke and sometimes threw his pills on the ground or across the room. When she learned at the hospital that it was methamphetamines, she had no explanation for what had happened.

Mother stated that father used methamphetamines, but never around the minor. According to mother, the paternal grandmother also used

methamphetamines.  Mother further reported that father was mentally and physically abusive towards her, constantly belittling her and even punching her when she had the minor in her arms.  She acknowledged that father's home was an unsafe environment for both her and the minor.

The social worker asked mother if she would sign a release so that the social worker could view urine samples from her earlier hospitalization.  Mother responded that she would sign release forms and was willing to do anything to keep P.P. with her.  Later, stating she wanted to be honest, mother admitted relapsing on methamphetamines two days ago, stating she had made a mistake.  Mother reported that she was unsure how or when the minor ingested the methamphetamines.

When interviewed by the social worker and police officers, the paternal grandmother stated that there was no " 'Meth' " in her home and that she does not allow drug usage.  She confirmed that the paternal grandfather did take medications after having a stroke and would throw them when he did not want to take them.  When the paternal grandmother went upstairs to ask father to come down and speak to the police, father declined.  The paternal grandmother did not want mother in the home but did not want her grandson on the streets.  She did not know whether mother had a drug problem but stated that she had "no concerns" about substance abuse for her son or herself.

Father later spoke to the officers from the top of the stairs, stating that the marijuana which the officers had seen during their earlier visit to the home was mother's; that he had been in recovery for three years, six months and did not smoke marijuana; and that he had concerns mother was mentally unstable.  He explained that mother had been staying longer than the three weeks they originally intended because her car needed repair.  Now that it

was fixed, he wanted her to leave. When asked, father stated he would only participate in drug testing if he was ordered to, as he was tired of proving himself. He asserted that P.P. had been fine all day and that when the minor woke up from his nap, he gave him a bath and then woke mother up to make the minor something to eat. Father went out to do some yardwork and when he returned, P.P. was acting strangely. He stated he would like to have full custody of P.P. and that it was " 'a good thing this happened.' "

The social worker spoke to mother's adult daughter, K.S., by telephone. K.S. reported that she and her 16-year-old brother lived with their father, S.R. K.S. lived with mother and father for about a year in 2020, moving out shortly after the minor was born. During this timeframe, she "would see 'meth pipes in the bathroom and kitchen and baggies.' " When she asked mother if she was using, mother stated the drugs were father's. K.S. knew that mother had relapsed in the past but did not know how recently. She was never sure if mother was using methamphetamines at the time. However, she reported that both father and the paternal grandmother were.

The social worker also spoke to S.R. by telephone, who reported that the minor's older half-brother had been living with him for the last six years and was doing well in a safe environment. According to S.R., the children were with him because mother had issues with methamphetamines in the past, but he did not know if she was currently abusing drugs. His son visited his mother once per month until recently. According to S.R., the visits stopped because it is " '[a]ll bad in that household,' " and K.S. had asked him not to send her brother because there was drug paraphernalia all over the house. The Department detained P.P. on August 17.

### B. *Petition and Post-Petition Continuances*

On August 19, 2022, the Department filed a dependency petition with respect to P.P., alleging that the minor came within the provisions of section 300, subdivision (b)(1) due to his ingestion of methamphetamine while in the care of both parents; mother's history of methamphetamine use, including during her pregnancy with P.P.; and mother's acknowledged relapse two days before the incident. The petition additionally alleged that the police found the family home to be " 'filthy,' " with food throughout the home, cigarette butts on the floor, dirt on the floors and walls, and an open marijuana container accessible to the minor. At the detention hearing on August 23, 2022, the court made removal findings, the parties waived time, and the matter was continued to October 13, 2022 for a combined jurisdictional and dispositional hearing. Mother was expressly ordered to submit to random drug testing (urine or hair strand) as arranged by the social worker.

In anticipation of the jurisdictional/dispositional hearing, the Department submitted a report indicating that mother now believed the toxicology screen on P.P. was invalid because it did not detect the medications he was given at the hospital. Prior to becoming pregnant with P.P., mother reported working as a certified nursing assistant for 17 years. She recalled first using substances at age 16, when she tried marijuana and then LSD and ecstasy for a few months. She first used methamphetamines at age 17, but stopped when she discovered she was pregnant at age 18. According to mother, she started using methamphetamines again every other day in 2018, and then every day with father from March 2020 until she discovered she was pregnant in April 2020. Mother tested positive for marijuana and amphetamines on August 23 and September 7, 2022, with a normal test on September 1. Thereafter she missed three tests between

September 14 and 30. She informed the social worker on September 23 that she would be testing at Quest in the future as she did not feel that " 'someone should watch her pee.' " When the social worker asked mother to provide any test results from Quest on October 4, 2022, mother declined, saying she would only provide them to her attorney at court.

Mother had attended all available visits. She was referred to dependency drug court, family preservation services, substance abuse treatment, and housing resources. In addition, mother was participating in a parenting program, had contacted a mental health access line, and stated she was attending Narcotics Anonymous sessions. Mother wanted another chance to take care of the minor. She challenged many of the statements made in the detention report as either errors or miscommunications. The Department acknowledged mother's deep love for the minor and recommended that reunifications services be provided to both parents.

On October 6, 2022, father substituted in new counsel. On October 13, 2022, the matter was continued to December 5, 2022 for a contested hearing. No party objected to going beyond 60 days from removal, and the court found exceptional circumstances. On November 9, 2022, mother filed a section 388 motion without the assistance of her attorney, requesting that the court return P.P. to her care and terminate jurisdiction over the minor. Attached to the motion were multiple documents offered in support, including research mother had done with respect to false positive drug tests and her constitutional rights to parent her child as well as argument that the social worker did not offer services that would have eliminated the need for removal of the minor. The court set the modification petition for initial hearing on December 6, 2022.

At the trial management conference on December 1, father's attorney requested a continuance of the contest, indicating that she was in touch with a medical expert who was willing to testify but who needed more time to review medical records. The Department was willing to agree to a short continuance but did not want an extended continuance given how long out the trial had already been set. Mother's attorney indicated she opposed any type of continuance. Mother then spoke to the court, claiming that "from the beginning of this, we've never got proper anything. Nobody has heard anything we have to say from day one." She argued that the social worker "made no efforts to try to help" before removing P.P. and that he had already been out of their home for five months. After clarifying that the Department had the discretion to increase visitation, the court found good cause to continue the matter to the soonest possible date of January 6, 2022. The date for hearing on mother's section 388 petition was confirmed for December 6.

In advance of the section 388 hearing, the Department submitted a responsive report. P.P. had moved to a new foster placement on November 28, 2022. With respect to mother's contention that the minor ingested the paternal grandfather's Carvedilol, which apparently can cause a false positive for amphetamines or methamphetamines, the social worker confirmed that the paternal grandfather did have an active prescription for Carvedilol. Follow up with the hospital disclosed that no confirmatory test had been done and that the sample had not been retained, so confirmatory testing could not be completed. The social worker had inspected the family home and found it free of any visible health hazards or property damage. However, mother had missed 11 scheduled drug tests since September 14, 2022. The Department recommended that the allegations in the dependency petition be adjudicated, and the section 388 request be denied.

8

## C.    *Mother's Issues With Counsel*

At the section 388 hearing on December 6, 2022, mother's attorney confirmed that he did not join in the 388 motion nor file it.  The Department opined that mother had not established a change in circumstances as to her drug use but indicated it would not object to setting the matter for an evidentiary hearing if it could be set on the same day as the jurisdictional/dispositional contest.  When the juvenile court indicated its inclination to follow this course of action, mother objected, stating that P.P. had been removed from her care without proper evidence.  She went on to explain:  "The reason why my appointed attorney, he's never helped me, either, that's why I filed this motion on my own because I've not had any help through this whole process."  The court explained that there had to be a hearing on the facts and that it was the court's job to do what was best for the child.  The following colloquy then occurred:

> "THE COURT:  That's why everybody gets a lawyer.  The child has a lawyer, you have a lawyer.

> "THE MOM:  My lawyer hasn't helped me through this whole process, though.

> "THE COURT:  We can go from there.  What I'm going [to] do, I'm not going to change anything at this time.  I'll confirm those dates and you can meet with your lawyer and prepare and get ready."

On December 27, 2022, father's retained counsel filed a declaration and request to be relieved as counsel, citing difficulties with the representation.  At the trial management conference on January 5, 2023, the juvenile court relieved father's attorney and appointed replacement counsel.  It continued the contested hearing to January 27, 2023.  Mother again commented at this January 5 hearing:  "[M]y appointed attorney has not really helped me

9

through this whole process, hasn't helped me through any of the steps at all. I [] try to talk to him, and he's told me to shut up and listen to him. So I've been doing this all by myself. He has not tried to help me." The following exchange then occurred:

> "THE COURT: . . . I am going to ask that you actually meet with your attorney and discuss any issues you have regarding your case, your case plan, et cetera with him and we will—

> "[Mother]: My understanding though he's supposed to listen to me and not tell me to be quite [sic] the whole time. He's supposed to listen to what I have to say though, like the truth of what has gone on with my child. Pretty much when I try to talk to him he doesn't listen or want to help me.

> "THE COURT: I appreciate you tell me these things because he's actually present and hearing them and maybe from your comments he'll better understand your position.

> "[Mother]: Thank you."

Mother then asked if the minor could be returned pending the contested hearing and asked if the section 388 request would be heard that day. At that point, the Department stated that it believed mother had not met her prima facie burden to show change of circumstances or best interests of the child and requested the court deny the modification request without an evidentiary hearing. The court indicated it had read all of mother's papers and was very sorry P.P. had ingested something and that the hospital did not keep the specimen for confirmation. The court continued: "I get all of those things, but I am also very sorry that there were a lot of missed tests on your part and dad's part because what I want to see from you is that you are negative and you have been negative and you're consistently negative. And

10

that tells me more likely than not this was an accidental ingestion of grandfather's medication as you indicated, but I don't have that." On this basis, it denied the modification request. The court then remarked to mother's attorney that it sounded like his client "has a lot of information and sounds like she would like a meeting with you where she presents and you hear her out." Counsel indicated he understood.

At the pre-trial conference on January 19, 2023, mother again asserted that her attorney had been "very unhelpful" to her, and for the first time said: "I would no longer like him to be my attorney. I don't want him as my counsel anymore. [¶] I would—I'll just defend myself, or something, because I don't feel like he has wanted to listen to me or help me. He basically just keeps telling me I'm wrong about everything I had said or try to give him information that I thought was important for him to see. Also, I tried to give him the paperwork that I was trying to give to you last court date, and he refused to take it from me and said that you weren't going to read it anyways. [¶] So I would no longer like him as my counsel." Mother also asserted: "But I also don't want to continue—I don't want a continuance, either, so, I mean, if anything, I guess I'll just do the best I can to—to defend myself."

The juvenile court stated it was sorry mother had been unable to "connect" with her attorney, who the court described as "one of the more experienced attorneys." It cautioned: "But we do have a very important hearing next week, and while I hear that you want to do the best you can on your own, if you represent—we haven't gotten there, but if you represent yourself, I have to treat you the same way that I would treat an attorney. I would not be able to give you any special accommodations, special time, special—any consideration. I'd have to treat you equally." Mother said that she understood and that she did not "want any special treatment." Mother

11

believed she knew herself and the situation better than her attorney. She noted that father's attorney had given him more time in the few weeks she had represented him than her attorney had given her during the entire process. And she complained that her attorney had not tried to reach out to her and that, once, when he returned her call, he hung up when she answered.

When the court opined that it sounded like her relationship with her attorney had fallen apart, mother concurred. Her attorney agreed, stating: "Given the positions that [mother] wants to take, and I do not feel legally they are viable positions or, as an attorney licensed in California, I cannot ethically present those arguments to this Court. And that's been the breakdown all along. [¶] As I've told the Court on other occasions, I believe that [mother] is competent. I think she's done a lot of work in this case. It may be misguided as far as the direction goes, but I think she has done a significant amount of work to educate herself. I'm not worried, necessarily, about her ability to represent herself. [¶] But as far as my—relieving me as counsel of record, I would agree. [¶] We had a meeting last week, and it ended very poorly. And in the past, any recommendation that I have given to [mother] about how to proceed, she has not followed them and, in fact, filed her own JV-180. And its been essentially herself representing herself for the last several months anyway." Counsel for the Department, the minor, and father deferred to the court as to whether there had been a breakdown in the attorney/client relationship. The juvenile court commented that it was difficult to relieve mother's counsel as he was so experienced but found a breakdown in the relationship and concluded there was nothing that could be done to remediate it before the next week. It therefore relieved mother's attorney.

12

The juvenile court then asked mother if she would like another attorney appointed for her. It noted that the attorney would be experienced in dependency matters and stated: "[O]ne of the concerns I have for you is that you do have a lot—it sounds like you have a lot of research that you've done and that perhaps you pulled some things from the Internet, maybe some reports, et cetera, that you want the Court to look at. [¶] And so I'm a little concerned, because the Evidence Code would—I mean, you do have to follow the Evidence Code and some of the other procedural Rules of Court. And I don't know if you have any experience in that. But that could affect your hearing."

Mother stated she would be okay with another attorney if there was not a continuance of the hearing. After the court said it was not sure it could appoint an attorney that would be ready by the next week, mother responded: "Well, then, I'll just proceed with representing myself. I'm pretty sure that I can—the Evidence Code, I have been getting familiar with that in this last week. And there's some other things that I have been getting myself familiar with. I have done a lot, a lot of research. And then [father] has—as well, has helped me. And he has done a lot hisself [sic]. [¶] So if there were—if there would have to be another continuance, I will just proceed with doing the best I can to defend myself. I feel that I can."

Counsel for the Department and minor's counsel expressed concern about mother's ability to represent herself given the complexity of the dependency law and mother's inability to control her emotions. Mother objected and responded by arguing that the examples that the Department's counsel had cited were not as described. When the juvenile court told her she had to slow down for the court reporter, mother responded: "I understand, and I apologize. . . . I will do my best to not talk as fast.

13

After reiterating to mother that she would have to follow court procedures and rules—which do not allow, "for example, interruptions, freak-outs, anger outbursts, et cetera"—even though the hearing would be understandably stressful and emotional, the court stated it would allow her to represent herself. In doing so, the court opined that it was in the interests of the minor and his parents to resolve the matter without any further continuances. Mother said she understood. The court then commented that the hearing judge could not help her and that she would need to be prepared. Mother responded: "Yes, I understand. And I—as I said, I will do the very best. I feel that I have done enough research already, and I will just continue to rack my brain for the next week, and I will be sure to come prepared, to the best of my knowledge." [¶] [¶] And I will do the best I can to control my emotions, because this is very important to me." Mother then successfully argued for a change in visitation from virtual to in person prior to the contest. The parties next talked through various pre-trial and discovery matters, with mother asking appropriate questions. Finally, mother was receptive to the court's suggestion that she just say " 'I need a moment' " if she became angry or upset during trial, stating she would work on it from that day until the date of the contest.

## D.   *The Jurisdictional and Dispositional Hearing*

The jurisdictional and dispositional hearing was finally held the next week on January 27, 2023. In connection with the hearing, the Department filed an addendum to its previous report. Per that addendum, mother had continued to miss drug tests through the Department, and the social worker had not received any results from alternate testing sites. The Department remained concerned about mother's unaddressed substance abuse issues, given her initial positive tests followed by her failure to test. It continued to

14

recommend reunification services for both parents. Attached to the report were a number of submissions from mother, including a visitation log prepared by mother, various letters in support of mother, and a parenting class certificate of completion.

The court began the hearing by reminding mother that she had the right to an appointed attorney. The court described the pitfalls to self - representation and asked mother if she wanted to proceed without counsel. Mother responded: "Yes, at this point, your Honor." The court explained the process that would be followed, and mother indicated she had no questions. The Department then moved to dismiss allegations with respect to the dirty house, as those issues had been rectified, and the court granted the motion.

The Department called mother as a witness. Mother acknowledged failing to drug test, stating that she did not feel she should have her privacy invaded when she had never been in trouble. She testified she would do a monitored drug test if the Department could show her evidence that she was using. Later, she agreed she would test if the court ordered it. She admitted telling the hospital nurse she had relapsed two days before P.P. went to the hospital, but claimed she said it because she was under stress and pressured by the police. After being questioned, mother was permitted to make a statement to the court related to the questions she had been asked. Father testified next, with a brief cross-examination by mother. During his testimony, he acknowledged that the Department had made an offer to return the minor to the parent's care if they completed hair strand tests and drug tested negative for one month. Father stated he would not do a hair strand test even if ordered to by the court. Next, the Department admitted all the prior reports into evidence. Father's attorney then called the social worker to the stand, and mother cross-examined her. The social worker

expressed concern that the parents would not cooperate with the Department if P.P. were returned to their care under a family maintenance plan.  Finally, mother was allowed to give a sworn statement on her own behalf.

After argument, the juvenile court sustained the petition allegations that P.P. had ingested methamphetamine in August 2022 while in the care of his parents.  Moving on to disposition, the court, noting the appropriate standard of clear and convincing evidence, removed the minor from both parents and ordered reunification services, explaining that "once we have a reasonable track record of clean tests and treatment as necessary, then we can take a look at the issue of returning [the minor] to your home with family maintenance services."  The court set a 60-day interim review.  It then explained that mother was still entitled to a court-appointed attorney if she wanted one.  Since the judge had not been at the prior hearing, he asked for clarification as to whether there had been a *Marsden* hearing or a request for self-representation by mother, and father's attorney clarified that it had been a request for self-representation.  Mother then requested counsel, and counsel was appointed for her.

This timely appeal followed.

## II.  DISCUSSION

### A.    *Representation by Counsel in Dependency Court*

#### 1.    *Legal Framework*

Section 317, subdivision (b) requires appointment of counsel for an indigent parent or guardian in a juvenile dependency case where the minor is placed in out-of-home care "unless the court finds that the parent or guardian has made a knowing and intelligent waiver of counsel as provided in this section."  (See also § 353 [at the first hearing on a dependency petition, if a parent "is unable to afford counsel and *desires to be represented by counsel*,

16

the court shall appoint counsel," italics added].)  A parent may waive counsel at any point.  (*In re Jaime R.* (2001) 90 Cal.App.4th 766, 771–772.)  A waiver of counsel is valid if the juvenile court has apprised the parent of the dangers and disadvantages of self-representation and the risks and complexities of his or her particular case.  (*In re Brian R.* (1991) 2 Cal.App.4th 904, 921; accord, *In re A.M.* (2008) 164 Cal.App.4th 914, 923 (*A.M.*).)  "Section 317, subdivision (b) has been interpreted to give a parent in a juvenile dependency case a statutory right to self-representation."  (*A.M.*, at p. 923, citing *In re Angel W.* (2001) 93 Cal.App.4th 1074, 1083 (*Angel W.*).)  Thus, the juvenile court "must respect the right of the parent to represent him- or herself as a matter of individual autonomy and avoid forcing the mentally competent parent to proceed with appointed counsel in the guise of protecting a person who is unskilled in the law and courtroom procedure."  (*Angel W.*, at p. 1084.)

Moreover, it bears repeating that the right to self-representation in juvenile dependency proceedings is statutory only.  "[A] parent in a juvenile dependency case does not have a constitutional right to self-representation." (*A.M.*, *supra*, 164 Cal.App.4th at p. 923; *Angel W.*, *supra*, 93 Cal.App.4th at p. 1082.)  Thus, there is no requirement for the juvenile court to "engage in a full *Faretta*-type admonition and inquiry" before ruling on a parent's request to discharge appointed counsel and proceed in propria persona.  (*Angel W.*, at p. 1084, referring to *Faretta v. California* (1975) 422 U.S. 806.)  Moreover, "in dependency proceedings, a parent's statutory rights, including the right to self-representation, must *always* be weighed against the child's right to a prompt resolution of the dependency proceeding.  The juvenile court must consider this right in deciding whether to accept a parent's waiver of counsel and request for self-representation."  (*A.M.*, at pp. 925–926.)  On appeal, we will not disturb a juvenile court's decision that a parent is competent to waive

17

counsel absent an abuse of discretion.  (*People v. Welch* (1990) 20 Cal.4th 701, 735; see also *Angel W.*, at p. 1085.)

With respect to the related but distinct issue of requests for substitute appointed counsel, *Marsden*, *supra*, 2 Cal.3d 118, holds that when a defendant in a criminal case "requests substitute appointed counsel, the trial court must permit the defendant to explain the specific reasons why the defendant believes current appointed counsel is not adequately representing [him or her]." (*In re V.V.* (2010) 188 Cal.App.4th 392, 398, citing *Marsden*, *supra*, 2 Cal.3d at pp. 123–124.) "Juvenile courts, relying on the *Marsden* model, have permitted the parents, who have a statutory and a due process right to competent counsel, to air their complaints about appointed counsel and request new counsel be appointed." (*In re V.V.*, at p. 398, citing § 317.5 and *In re James S.* (1991) 227 Cal.App.3d 930, 935, fn. 13; see also *In re Z.N.* (2009) 181 Cal.App.4th 282, 289 (*Z.N.*) [*Marsden* principles apply by analogy to dependency proceedings].)

However, a client's claims of a lack of trust, an inability to get along with a lawyer, or tactical disagreements are insufficient to prevail on a motion to discharge appointed counsel.  (*In re M.P.* (2013) 217 Cal.App.4th 441, 458 (*M.P.*).  Rather, a defendant is entitled to relief only if "the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. Substitution of counsel lies within the court's discretion.  The court does not abuse its discretion in denying the motion unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." (*People v. Carter* (2010) 182 Cal.App.4th 522,

527, quoting *People v. Smith* (2003) 30 Cal.4th 581, 604; accord, *Z.N.*, *supra*, 181 Cal.App.4th at p. 294.)

### 2. *No Error in Allowing Mother to Represent Herself*

Mother asserts that she was denied competent counsel at the jurisdictional and dispositional hearing in this case because the court denied her a proper *Marsden* hearing before relieving appointed counsel and never conducted a proper inquiry regarding her competence to represent herself. Mother also argues that the juvenile court failed to obtain a voluntary and intelligent waiver from mother of her right to counsel. We are not persuaded.

Preliminarily, we agree with the Department that a *Marsden* procedure was not required in this case. According to mother's appellate attorney, her statement that she would just represent herself *or something* was sufficient to trigger a full *Marsden* inquiry. But mother never made a motion, or even expressly requested, substitute counsel. (See *People v. Gonzalez* (2012) 210 Cal.App.4th 724, 741 [under *Marsden*, the client "must give ' "at least some clear indication . . . that [he or she] wants a substitute attorney" ' "]; *People v. Montiel* (1993) 5 Cal.4th 877, 906 [a request for substitute counsel is required to trigger *Marsden*], disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; see also *People v. Clark* (1992) 3 Cal.4th 41, 105 (*Clark*) [" '[a] request for self-representation does not trigger a duty to conduct a *Marsden* inquiry' "], disapproved on other grounds as stated in *People v. Edwards* (2013) 57 Cal.4th 658, 704–705.) As recited at length above, mother began by stating she wanted to represent herself. Admittedly, her initial statement could be viewed as somewhat equivocal and at one point she did state she would "be okay" with an attorney if there were no further continuances. However, after the court discussed the matter with her, mother ultimately clarified: "I will just proceed with doing the best I can to

19

defend myself. I feel that I can." Under the circumstances, we will address the propriety of mother's self-representation under *Faretta* and its progeny.[3]

As discussed above, a competent parent may, after proper advisement, knowingly, intelligently, and voluntarily waive his or her statutory right to appointed counsel in dependency proceedings. Mother acknowledges as much. But she argues that the court never inquired of her whether she was competent. We see no need for a direct inquiry as to general competency when the record and the court's prior interactions with a parent establish either competence or a lack thereof, as is the case here. (See *Clark*, *supra*, 3 Cal.4th at p. 107 ["The relevant inquiry is narrow. The trial court is not concerned with the wisdom of [the] defendant's decision to represent [himself/herself], or with how well [he/she] can do so. The sole relevant question is whether the defendant has the mental capacity to knowingly waive counsel while realizing the probable risks and consequences of self-representation."]; *id.* at pp. 107–108 [in finding competence, a court can exercise its discretion "in light of its own observations and the record as a whole"].)

In this case, the record reveals that mother had worked as a certified nursing assistant for 17 years. Moreover, she was able to advocate effectively

---

[3] Even if we were to view the juvenile court's actions through a *Marsden* lens as mother suggests, we would find no error here and certainly no abuse of discretion. The court spoke with mother repeatedly regarding her increasing frustration with her attorney over the course of several hearings, and mother gave numerous specific reasons why she believed she was not being adequately represented. Based on this information, the court stated that it sounded like an irreconcilable conflict might exist, and mother concurred. Thereafter, mother's attorney also agreed the relationship had fallen apart and gave even more context regarding the crux of the problem. The court acknowledged the breakdown in the relationship and concluded that nothing remedial could be accomplished before the contested hearing the following week. No more would have been required under *Marsden*.

for herself at a number of hearings, both before and after she was permitted to proceed in propria persona. For instance, at the pretrial conference on January 19—after the court relieved appointed counsel—mother convinced the judge to order the resumption of her in-person visits with P.P. prior to the contested hearing the following week.

It is true that both the Department and minor's counsel expressed concern about mother's self-representation, given the complexities of the dependency law and mother's difficulty, at times, controlling her emotions. However, mother indicated several times that she had been doing a lot of dependency research, as well as looking at the Evidence Code. She researched and filed a modification petition pursuant to section 388 without any assistance from counsel. And, while she was understandably emotional given the subject matter of the upcoming hearing, she was respectful to the judge and took advice and direction well. For example, when admonished not to speak too quickly, mother responded: "I understand, and I apologize. I've just—I've always talked fast, but I will do my best to not talk as fast." She then went on to explain calmly why she disagreed with how counsel for the Department characterized certain of her interactions with staff. Finally, her appointed attorney stated that, despite their disagreements, he believed mother was competent, elaborating: "I think she has done a significant amount of work to educate herself. I'm not worried, necessarily, about her ability to represent herself." In short, there is more than substantial evidence in the record of mother's general competence.

Mother also argues, however, that the court failed to elicit a knowing and intelligent waiver of her right to appointed counsel. Again, we disagree. The court told mother on several occasions that it was reluctant to relieve her appointed counsel because he was so experienced, having been handling

21

dependency cases exclusively for at least five years. He told mother that the upcoming hearing was very important and that she would have to be treated without any special consideration, like any other attorney, if she represented herself. Mother indicated she understood and did not want special treatment. The court also offered to appoint another attorney for mother who was familiar with dependency law, and expressed concern that mother might be unable to follow things like the Evidence Code and the procedural rules of the court. It explained to mother that her lack of knowledge could affect the hearing. Mother responded that she would represent herself, stating: "I'm pretty sure that I can—the Evidence Code, I've been getting familiar with that this last week. And there's some other things that I have been getting myself familiar with. I have done a lot, a lot of research." After the Department and minor's counsel expressed their concerns with mother representing herself, the court reiterated to mother that she would have to follow court rules and procedures, that anger outbursts or interruptions would not be allowed, and that they would hurt her case if she engaged in them. Mother indicated she understood. The court further noted that the judge hearing the contest would not be able to help her with questions or give her direction as to how to present her case so she would have to be prepared. Mother stated she understood and would do her best to come prepared and control her emotions because "this is very important to me." Under the circumstances, we conclude that the juvenile court adequately apprised mother of the dangers and disadvantages of self-representation, especially in the complex area of dependency proceedings, and that mother knowingly and intelligently waived her right to appointed counsel.

Finally, as mentioned above, when considering a parent's request to represent themselves in dependency proceedings, a juvenile court must

22

always consider the child's interest in a prompt resolution of those proceedings. (*A.M.*, *supra*, 164 Cal.App.4th at pp. 925–926.) Here, the juvenile court concluded that it was in the best interests of P.P. *and* the parents to have the jurisdictional and dispositional hearings resolved without further continuance. Having reviewed this matter in some detail, we wholeheartedly agree.

In sum, we see no reason to disturb the juvenile court's order allowing mother to proceed in propria persona at the jurisdictional/dispositional hearing.

## B.     *Dispositional Removal Order*

### 1.     *Legal Framework*

After finding that a child is a person described in section 300, the juvenile court, "shall hear evidence on the question of the proper disposition to be made of the child." (§ 358, subd. (a).) In doing so, the court considers the social worker's report and any relevant or material evidence offered. (*Id.*, subd. (b)(1).) The court generally chooses between allowing the child to remain in the home of a parent with protective services in place and removing the child from the home while the parent engages in services to facilitate reunification. (*In re E.E.* (2020) 49 Cal.App.5th 195, 205.)

In order to remove a child from parental custody at a dispositional hearing, the juvenile court must make one of a number of statutorily enumerated findings by clear and convincing evidence. (§ 361, subd. (c).) Here, the juvenile court found with respect to P.P. that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home," and that there were "no reasonable means" by which the minor could be protected short of removal. (*Id.*, subd. (c)(1).) A removal order on these grounds " 'is

23

proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances.' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*O.B.*).) The "no reasonable alternatives" and "reasonable efforts" findings made in dependency proceedings are linked. (See *In re Ashley F.* (2014) 225 Cal.App.4th 803, 809.) Essentially, a juvenile court must determine that despite the reasonable efforts of the child welfare agency there were no reasonable means of protecting the child except to remove him/her from the home. (*Id.* at p. 811.)

"[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, *supra*, 9 Cal.5th at pp. 995–996; see also *In re V.L.* (2020) 54 Cal.App.5th 147, 154–155.)

### 2.     *Substantial Evidence Supports the Removal Order*

Mother argues that there was not substantial evidence in this case of a substantial danger to the minor necessitating removal from her physical custody at the dispositional hearing.  She asserts that the removal order was based solely on her failure to drug test, but she believed that testing was only a request rather than an order of the court.  She points to the positive things she had been doing, such as engaging in positive visitation, taking parenting classes, and attempting to secure counseling.  And she asserts that there was no reason to believe that she would not drug test if court-ordered to do so and that any worry by the Department that she would not cooperate if P.P. was returned to her care was insufficient to support a removal order.  Mother's claims, however, are belied by the record.

First, in the jurisdictional phase of the hearing, the juvenile court found true by a preponderance of the evidence the allegation that P.P. was at substantial risk of suffering serious physical harm, abuse, and/or neglect due to his ingestion of methamphetamine while in the care of both parents; mother's history of methamphetamine use, including during her pregnancy with P.P.; and mother's acknowledged relapse two days before the incident. In support of this finding, the court cited mother's own description of how P.P. was acting, the presumptive positive test at the hospital, statements made by both parents about the drug use of the other parent, the parents' positive tests for methamphetamine shortly after the incident with the minor, and their subsequent refusal to drug test.  The court also found—as relevant to both jurisdiction and disposition—that mother was court-ordered to test and had been asked to test by the Department.

The juvenile court went on to conclude, "based upon a review of all of the evidence" and under the clear and convincing standard of review, that

25

removal was warranted. In doing so, it found that there was nothing that could be put in place at that time that would render the minor's return home safe. The court pointed specifically to the minor's young age, the parent's history of addiction, their relapses, and their positive tests, followed by series of missed tests. To this evidence we would add: mother's mixed reports with respect to her drug usage; mother's reports of domestic violence in the house with the minor present; the reports of the paternal grandmother's use of methamphetamines; K.S.'s description of the extensive drug paraphernalia lying around the house when she lived there around the time of P.P.'s birth; and S.R.'s refusal to send his son to visit mother given the conditions in the home.

In sum, it is clear that the removal order was not based solely on the parents' missed drug tests but instead on a conclusion—amply supported by the evidence even under the heightened standard of proof—that it was not safe to return P.P. to a home where he might again be exposed to harmful substances. Whether the court had the power to require drug testing before obtaining jurisdiction in this matter is not really the point. The parents were repeatedly informed that, under the circumstances, they needed to provide a reasonable track record of negative drug testing to prove their sobriety prior to the return of the minor and yet they chose not to do so, despite facilitation of the testing by the Department. That mother claimed repeatedly she would do anything to get her son back and yet made excuse after excuse for failing to drug test certainly suggests that she might continue to avoid testing in the future and that parental cooperation might become even less robust if the minor was placed back with the parents under a family maintenance plan.

We note finally that the trial court ended the hearing at issue by describing the positive efforts that had been made in this case with respect to

26

the condition of the family home, parenting classes, and successful visitation with the minor.  It believed that if mother carried forward the sincerity expressed at the hearing and engaged in drug testing and any necessary substance abuse treatment, she could "address some of these issues in a pretty quick fashion."  And it set a 60-day interim review hearing with that in mind.  While we have concluded that a substantial risk still existed for this young minor at the time of the contested jurisdictional/dispositional hearing, we stress that juvenile dependency proceedings are meant to protect the child, not to blame or punish the parents, and we agree with the trial court that mother has made some commendable progress.  Moreover, she clearly cares deeply for P.P.  We are hopeful that mother has been engaging in services and following the terms of her court-ordered plan so that reunification can occur soon, if it hasn't already.

### III.  DISPOSITION

The jurisdictional findings and dispositional orders are affirmed.

HUMES, P.J.

WE CONCUR:

MARGULIES, J.

BANKE, J.

A167129N