Filed 3/28/24  In re J.M. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

<table>
<tr><td>In re J.M. et al., Persons Coming Under the Juvenile Court Law.<br><br>SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.C.,<br><br>    Defendant and Appellant.</td><td>E081012<br><br>(Super. Ct. Nos. J295219, J295220, J295221, J295222)<br><br>OPINION</td></tr>
</table>

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed in part, reversed in part with directions.

Mansi Thakkar, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Jessica L. Morgan, and Landon C. Villavaso, County Counsel, for Plaintiff and Respondent.

I.

INTRODUCTION

During a jurisdiction/disposition hearing, the juvenile court terminated jurisdiction over J.R. (Father) and M.M.'s (Mother) four children, Ez.M. (born in 2012), E.M. (born in 2014), S.M. (born in 2018), and J.M. (born in 2022) (the Children). The Children were removed from Father's custody, based on findings he committed domestic violence against Mother in the Children's presence. The Children were permitted to remain with Mother.

Father appeals the exit orders (1) terminating supervised visitation, (2) finding visitation between the Children and Father detrimental to the Children's physical and emotional well-being, (3) authorizing Mother to move out of the county and state without prior approval of the court or notice to Father, and (4) finding Father is an alleged father of J.M. Father contends there was insufficient evidence to support these orders and they violate his due process rights. He also contends that his attorney committed ineffective assistance (IAC) by not taking appropriate steps to establish his paternal status as to J.M. or object to the finding that he is merely an alleged father. Father is not objecting to termination of jurisdiction or the court awarding Mother sole legal and physical custody.

We conclude, based on the record as a whole, that the paternity status finding as to J.M. is unsupported by the record and was not properly addressed before the court terminated jurisdiction. In addition, the visitation order is ambiguous and internally inconsistent, within the context of the record as a whole. We therefore reverse and

2

remand the exit orders challenged in this appeal, with directions the juvenile court conduct a noticed hearing to reconsider, and revise to the extent necessary, the paternity status finding, the visitation exit order, and any related exit orders regarding visitation, including the visitation detriment finding and move-away order.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 18, 2022, San Bernardino County Children and Family Services (CFS) received an immediate response referral alleging emotional abuse and general neglect of the Children by Mother and Father (Parents).

On November 22, 2022, CFS met with Mother and the Children. Ez.M. and E.M. stated that Parents frequently argued, mostly regarding Mother cheating on Father. During one incident, Parents were yelling. Father pushed Mother and threw her. She fell on top of E.M., bruising E.M. E.M. wanted to protect S.M. from being injured during Parents' argument. E.M. reported that during another argument on Thanksgiving Day in 2020, Father slammed Mother's hand in a door, breaking one of her nails. When asked if Ez.M. and E.M. felt safe visiting with Father, E.M. said she did not feel safe with Father. Ez.M. said he felt "'50-50 [half safe, half unsafe].'" Ez.M. said he was concerned that Father was "'gonna hurt mom.'" Ez.M. and E.M. said they felt "'100% safe'" with Mother. They added that law enforcement had been involved in Parents' arguments before.

When CFS interviewed Mother, she admitted Parents had a history of domestic violence, involving both verbal and physical confrontations. Mother said she and the Children left Father in October 2021, after a domestic violence incident resulting in Father's arrest. Mother stated that Father had a history of anger management issues. Parents briefly participated in counseling, which Father stopped attending. Mother described Father as jealous and controlling, and continually accusing her of being unfaithful to him. Father also frequently made statements he wanted to die, and interrogated Ez.M. and E.M. when they visited him, often asking them about what Mother was doing and whether she was "'talking'" to other men.

On November 29, 2022, CFS interviewed Father. He reported that he was admitted into the Merrill Crisis Stabilization Unit for suicidal ideation. The previous year, Parents were going through a divorce but reunited in November 2021. While still married, in July 2022, they separated again. Father confirmed the domestic violence incident in 2021. During the incident, Father threw Mother on the bed and Ez.M. intervened. Father was arrested. Father told CFS that Mother instigated the argument by accusing him of cheating and attempted to hit him. According to Father, he attempted to stop her by grabbing her arms. Mother attempted to push Father and he pushed back, causing Mother to fall. Ez.M. entered the Parents' bedroom because of Parents' yelling, and reported the incident to the neighbors. Mother filed a request for a restraining order, but the request was stayed while Parents attempted to repair their relationship. Father

4

completed an anger management course and his criminal domestic violence case was dismissed.

Father reported that a few months after Parents reunited, they engaged in another domestic violence incident. They verbally argued while the Children were in the same room. As Father was attempting to leave the bedroom, Mother blocked him. He pushed Mother toward the wall, causing her to hit the laundry basket, which hit E.M., and left a mark on her. Father stated that in July 2022, Parents separated again after a verbal argument. He denied any physical altercation in July 2022. Father said Parents argued over Father drinking a couple of beers. Mother became upset and ended their relationship. She requested a restraining order, which was denied.

On November 29, 2022, CFS obtained a warrant to detain the Children from Father, because of concerns of general neglect of the Children. The following day, CFS contacted Father, who said he was discharged from the crisis center. He was prescribed antidepressants and anxiety medication. CFS notified Father of the detention warrant and detention hearing. CFS also notified Mother of the detention warrant and told her that the Children would remain in her care, with visitation between the Children and Father suspended.

A. *Juvenile Dependency Petition*

On December 2, 2022, CFS filed a juvenile dependency petition on behalf of the Children, under Welfare and Institutions Code section 300, subdivision (b).[1] The petition alleged that Parents engaged in domestic violence with each other in the Children's presence. Also, Father had a history of substance abuse and mental health issues that impacted his ability to care for the Children, and Mother should have known about it.

B. *Detention Hearing*

CFS stated in the detention report that Parents did not have a child welfare history and Mother did not have a criminal history. Father had one arrest in October 2021, for domestic battery. Father took an on-demand drug test which was negative. At the detention hearing on December 5, 2022, the court ordered reunification services for Parents, and conducted a paternity inquiry. Mother stated she believed Father was the biological father of all of the Children. The court ordered the Children detained from Father, and continued them in Mother's care and custody. Father was granted supervised visitation once a week at the CFS office.

---

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

C. *Jurisdiction/Disposition Hearing Report*

In January 2023, CFS filed a jurisdiction/disposition hearing report recommending dismissal of the petition allegations regarding Father's substance abuse, and that the court find Father the alleged father of J.M. and the presumed father of the other children. CFS reported that Father had visited the Children and was cooperating with services. CFS recommended Father have supervised visits once a week for two hours.

CFS reported that Mother denied being the aggressor during the domestic violence incidents. She first separated from Father in October 2021, and filed for divorce on October 26, 2021. On November 11, 2021, the family was referred to Family Court Services for mediation. Parents reunited, and then separated again in July 2022. The court referred the family to Family Court Services in August 2022, and October 2022.

Mother denied Father used drugs but said he occasionally consumed alcohol. She said Father had a temper and she had heard he went to jail for throwing a vacuum at his brother. While Parents were married, Father went to a crisis center after an incident in which he was breaking things and hitting himself. Father recently had texted Mother stating he wanted to "'kill himself.'" Father frequently called or texted her, but Mother did not respond.

Father told CFS he did not use any drugs after he met Mother, but acknowledged that during bad times, he had suicidal ideations. After reporting he wanted to jump off of a cliff, in November 2022, he was admitted to a 24-hour crisis center. Father completed 23 anger management classes and went to couple's therapy with Mother. He started

attending individual counseling once a week, and had completed three sessions. Father also took prescribed medication. Father reported he has anxiety attacks when not with the Children, but feels happy when with them.

Ez.M. reported that Parents did not get along well, and Father, not Mother, was at fault. On one occasion, Father grabbed Mother and threw her on the bed. Ez.M. went to a neighbor's house for help. During another incident, Father pushed Mother, who then landed on E.M. Ez.M. said Mother did not push back. Ez.M. told CFS his three wishes were for Father "to stop yelling, [F]ather to be with his family, and to have more video games to play with." Ez.M. also said he wanted visits with Father, but felt that Father needed classes to help him control his yelling. E.M. stated she felt comfortable with supervised visits with Father. She wished Father would get help, for her family to be together, and for her grandmothers to get along.

The Children's paternal grandfather told CFS that it was false that the Children did not want to visit Father. When they visited Father, they would often cry when they had to leave. The Children's paternal aunt (PA) described Father as a good father, and said the Children were excited to see him. She denied that the Children were worried or scared of him. PA never thought they should not be left alone with him. PA said Father was trying hard to reunify with the Children.

D. *Jurisdiction/Disposition Hearings*

During the jurisdiction/disposition hearing on January 10, 2023, Father requested paternity testing as to J.M. The court found Father to be the presumed father of Ez.M.,

E.M., and S.M., ordered paternity testing as to J.M., and continued the hearing. On January 13, 2023, Father submitted to paternity testing and the results confirmed that he was J.M.'s biological father.

On March 14, 2023, CFS filed an additional information report (also known as a 6.7 report), which stated that the paternity test results confirmed that Father is J.M.'s biological father. The report further stated that on February 7, 2023, after visiting with the Children, Father approached Mother's vehicle and showed her and the Children a picture on his cell phone of his wrecked truck. Mother said she felt Father was harassing her and did not want any contact with him. The Children said the picture made them feel "sad" and "uncomfortable." CFS reported that Father needed to be redirected from Mother, who did not want him contacting her. Mother's domestic violence counselor reported to CFS concerns about Father's behavior, and reported that she believed he had not benefitted from services.

The additional information report stated that Father had completed 10 of 12 parenting and domestic violence classes, and seven of eight individual therapy sessions. He was expected to complete these services by March 16, 2023. On March 9, 2023, Mother obtained a restraining order protecting her, but not the Children, from Father. Father agreed to the restraining order. CFS reported that it interviewed the Children privately and they refused to have visits with Father at the CFS office. The Children reported that they did not feel safe around Father. Ez.M. stated that Father "'does not pay attention to me.'" E.M. stated that Father "'does not care about me.'" Father reportedly

9

brought games and snacks to the visits.  During visits, the Children appeared bored and Father did not engage with them.  The CFS social worker reported that she believed Father was not benefiting from services.

During the contested jurisdiction/disposition hearing on March 21, 2023, Father objected to the court sustaining the petition allegations but did not present any evidence. The court dismissed the allegations regarding Father's substance abuse, and sustained the remaining allegations.  The court adopted CFS's proposed findings and orders in the jurisdiction/disposition report and additional information report, as modified.  This included terminating jurisdiction, which Father does not contest, and entering family law exit orders, in which the court granted Mother sole legal and physical custody, entered a finding that visitation would be detrimental to the Children's interests, denied Father continued visitation and authorized Mother to move out of state without notice to Father.

III.

EXIT ORDERS AND FINDINGS

Father contends the juvenile court abused its discretion when entering exit orders and findings (1) denying Father visitation, (2) finding visitation detrimental, (3) granting Mother authority to move away without notice to Father, and (4) finding that Father is an alleged father of J.M.  Father argues that the orders and findings are not in the Children's best interests and were not supported by substantial evidence.

10

A. *Applicable Law*

When terminating jurisdiction over a child who has been declared a dependent child of the court, "section 362.4 authorizes the juvenile court to issue a custody and visitation order (commonly referred to as an 'exit order') that will become part of the relevant family law file and remain in effect in the family law action 'until modified or terminated by a subsequent order.'[] When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.' [Citations.]" (*In re T.S.* (2020) 52 Cal.App.5th 503, 513, fn. omitted; see also § 362.4; *In re C.W.* (2019) 33 Cal.App.5th 835, 862-865.)

We review the juvenile court's issuance of the exit custody orders for an abuse of discretion. (*In re C.W.*, *supra*, 33 Cal.App.5th at p. 863.) We may not disturb such rulings unless they are arbitrary, capricious, or patently absurd. (*In re C.W.*, *supra*, at p. 863; *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

B. *Facts Relevant to Visitation Exit Orders*

At the detention hearing in December 2022, the juvenile court granted Father two hours of supervised visitation once a week, as recommended by CFS. In the January 2023, jurisdiction/disposition report, CFS stated: "Visitation between the child and the [F]ather is to be a minimum of one time a week for 2 hours, supervised." "Visits are to be supervised by an appropriate delegate from both parent's choosing and/or a professional monitor at the [F]ather's expense." CFS's recommended dispositional findings and orders did not mention visitation.

In CFS's March 14, 2023, additional information report, CFS reported the recent incident in February 2023, in which Father harassed Mother in the Children's presence, and thereafter, Mother obtained a restraining order against Father. Mother's domestic violence therapist expressed concerns about Father's recent behavior, and both CFS and the therapist stated they believed he had not benefitted from services, even though he had taken parenting, domestic violence, and anger management courses, and attended therapy. The Children privately told CFS they refused to have visits with Father at the CFS office. The Children reported that they did not feel safe around Father.

During the jurisdiction/disposition hearing on March 21, 2023, the Children's attorney stated she had "some very serious concerns about the behavior of the [F]ather. As outlined in the 6.7 report, it seems that Father is very obsessed or fixated on Mother. He has not benefitted from services he has completed, and he has completed almost the case plan that was required— would have been required of him. I don't know if the [c]ourt would be willing to entertain a detriment finding, but I am concerned Father will continue to show up—" The court responded, "I am willing to entertain it." The Children's attorney further requested a family law exit order allowing Mother to move out of the county or state without further court approval, "given that the [F]ather poses a risk and potential danger to the family." The court responded that its tentative was "to grant those."

Father's attorney objected, arguing that there were sufficient protections for the Children if Father's visitation was continued, because the visits would be monitored, the

12

visits could be stopped if there was any inappropriate behavior, and Mother had a restraining order. Father's attorney acknowledged that CFS reported in the 6.7 report that the Children did not want to engage in visitation, adding that the Children were "always free to refuse to see the [F]ather if they're not interested."

CFS submitted on its reports and recommendations and also submitted on the visitation detriment finding. CFS stated it was "concerned regarding the [F]ather's continued denial of his behaviors and continued not changing those behaviors, even though he has received services." The court ordered adoption of CFS's proposed findings and orders, with modification of the family law exit orders to "sole legal, sole physical to Mom. Detriment finding for [Father] for visits. Mom may move out of the county and state without prior approval of the [c]ourt or notice to Father." The court did not state anything further regarding its findings and orders. There was no mention of visitation.

CFS submitted a proposed "Custody Order—Juvenile—Final Judgment," Form JV-200 (Judgment), which the juvenile court signed and filed on March 21, 2023. The judgment states that sole legal and physical custody of the four Children was awarded to Mother. The court crossed out the visitation paragraph, wrote "Detriment," and checked the box that stated: "As stated on the attached form JV-205." The court also checked box no. 13, which states: "Other findings and orders (*including circumstances underlying any limits on custody or visitation at the time of the order*):" The following was handwritten thereafter on the form: "Mother may move out of County and out of State without prior approval of the court or notice to Father. Court finds Father's visits detrimental."

Attached to the judgment were forms JV-205 and 206. Form JV-205, entitled "Visitation (Parenting Time) Order—Juvenile," states at the top of form JV-205 that it is attached to the Judgment (JV-200). The court crossed out the portion of the form that had checked boxes for paragraph numbers 2, 3, and 4, entitled "Visitation (Parenting Time)," "Supervised Visitation," and "Transportation for Visitation and Place of Exchange."

Form JV-206, entitled "Reasons for no or supervised visitation-Juvenile," which was also attached to the Judgment, states that Father "was ordered to have" "*only supervised visitation* with the child or children" because Father had not completed "Domestic violence treatment program for offenders," "Parenting classes," "Individual counseling," and "Other." (Italics added.) Handwritten on the JV-205 form, following "Other," is stated, "Dad has stalking behaviors and poses a risk to the children."

The March 21, 2023, minute order states: "There will be *no visitation* between the [Children] and Father." (Italics added.) The minute order also states, "Visitation between the child and Father is detrimental to the child's physical or emotional well-being." In addition, the court ordered that "Mother may move out of county and out of state without prior approval of the court or notice to Father."

C. *Visitation Order*

Father contends there is insufficient evidence to support the juvenile court's exit order denying him visitation. He argues there was little evidence regarding his visits with the Children and no justification for denying him supervised visitation. Upon reviewing the record, we conclude remand is necessary because it is unclear whether the juvenile

14

court intended to terminate all visitation for Father or limit visitation to supervised visitation. The oral pronouncement of the judgment and exit orders, and the written judgment and exit orders, conflict with the minute order as to visitation. In addition, the written judgment and exit orders appear to be internally inconsistent or, at best, ambiguous in light of the record as a whole.

Inconsistencies between an oral pronouncement of judgment and the minute order are presumed clerical and generally are resolved in favor of the oral pronouncement. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Gonzalez* (2012) 210 Cal.App.4th 724, 744; *In re A.C.* (2011) 197 Cal.App.4th 796, 799-800 ["A juvenile court's oral exit order indicating the terms of a parent's visitation controls over the written order where the written order conflicts with the reporter's transcript, and this court has authority to remand the matter to the dependency court with directions to correct the written order."].) If the clerk's minutes diverge from the court's oral statements, any discrepancy is presumed to be a clerical error in the minutes. (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324.)

Here, the court's oral pronouncements during the jurisdiction/disposition hearing did not include any orders as to whether supervised visitation was continued or completely terminated. The court did not mention anything regarding visitation during the hearing. During the disposition portion of the hearing, the court stated it was adopting "the findings and orders." Although unclear, assuming the court was referring to CFS's recommended findings and orders in the jurisdiction/disposition report, those

15

findings and orders also do not mention visitation. However, the "VISITATION" section of the report states that Father shall have supervised visitation. During the disposition portion of the hearing, the court made a "[d]etriment finding for [Father] for visits," but did not state whether there would no longer be any visitation, or there would continue to be supervised visitation because of the detriment finding.

The Judgment and its form attachments regarding visitation contradict the minute order, which states that there will be no visitation. The written, signed Judgment and exit orders normally take precedence over the juvenile court's oral pronouncements and the minute order. (*Smith v. City of Napa* (2004) 120 Cal.App.4th 194, 199 ["we may not impeach the trial court's ultimate judgment with its remarks at the hearing on the petition or in announcing its ruling from the bench"]; *People v. Scott*, *supra*, 203 Cal.App.4th at p. 1324; *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756, fn. 1 [dependency court's written visitation order controls over potentially conflicting statements regarding visitation made during the hearing].)

The problem here is that, although during the hearing the court made a detriment finding as to visitation, the court did not make any oral pronouncement as to whether visitation shall be completely terminated or continued with supervision. Also, even if the court intended to continue supervised visitation, the exit order does not state the frequency and duration of the visits. Under such circumstances, this matter must thus be remanded to the juvenile court to clarify its findings and orders regarding visitation, because it is unclear from the judgment and record as a whole whether the juvenile court

16

intended to terminate all visitation for Father or allow supervised visitation. If the court intended to order supervised visitation, orders are required as to the frequency and length of time of such visits.

D. *Visitation Detriment Finding*

After terminating jurisdiction, the juvenile court made a visitation detriment finding pursuant to section 362.4. Father notes that during the disposition hearing, the juvenile court did not provide any reasoning as to why it made the visitation detriment finding. Father argues that the detriment finding was an abuse of discretion because it was not supported by substantial evidence. We disagree.

Evidence of visitation detriment includes information contained in CFS's reports showing that Father had a history of domestic violence, in which he initiated and escalated altercations with Mother, often either when the Children were nearby or present. On numerous occasions in 2021 and 2022, law enforcement was called and intervened because of Father's angry, volatile confrontations with Mother regarding visitation or court proceedings. At times, Ez.M. either intervened or called the police or a neighbor for help. Although Father asserts he did not intend to harm anyone physically, evidence shows that the Children and Mother nevertheless sustained physical and emotional harm from Father's confrontations with Mother. These confrontations continued throughout the dependency proceedings, despite Father having taken numerous anger management and domestic violence classes and participating in therapy.

17

Father continued to harass Mother and initiate confrontations with her, including the month before the March jurisdiction/disposition hearing, when Mother was picking up the Children from supervised visitation with Father in February 2023. Mother filed a request for a restraining order for protection from Father, which was granted on March 9, 2023. CFS reported that Father needed to be redirected from his obsession with Mother, who did not want any contact with him.

The form JV-206 exit order, entitled "Reasons for No or Supervised Visitation-Juvenile," states that supervised visitation was ordered because "[Father] has stalking behaviors and poses a risk to the children." There are also statements in the record that the CFS social worker and Mother's domestic violence therapist concluded that Father had not benefited from his services. In November 2022, when CFS initially interviewed the Children, E.M. said she did not feel safe with Father. Ez.M. said he felt "'50-50 [half safe, half unsafe].'" Ez.M. said he was concerned that Father was "'gonna hurt mom.'" In March 2023, CFS reported that the Children refused to have supervised visits with Father at the CFS office, and said they did not feel safe around Father.

Although it is unclear from the additional information report which Children were interviewed or when the interviews occurred, it can be reasonably inferred that the two oldest Children, Ez.M. and E.M., were interviewed, since the younger two children were quite young (4 years old and almost 6 months old). It can also be reasonably inferred that the interviews were relatively recent because the purpose of the report was to provide

18

updated information that concerned recent events and information that had not been previously reported.

We recognize that the Children's refusal to visit Father is not, alone, determinative, but is "'powerful demonstrative evidence'" that abiding by the Children's stated preference would be in the Children's best interest. (*In re C.W.*, *supra*, 33 Cal.App.5th at p. 866.) A child's wishes may not be the sole factor in determining visitation, because that would in effect delegate to the child the determination of whether any visitation will occur. But the child's wishes may be a dominant factor. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 48-52 ["a child's aversion to visiting an abusive parent may be a 'dominant' factor in administering visitation, but it could not be the *sole* factor"].)

Evidence in the record, including reports from CFS and Mother's domestic violence therapist, supports a reasonable finding that Father continued to not be able to control his behavior, had not sufficiently benefited from his services, and continued to harass Mother, to such an extent she felt compelled to request, and was granted in March 2023, a one-year restraining order against Father. Father's continuing harassment of Mother and initiation of confrontations with her in the Children's presence demonstrates Father's lack of self-control and inability to refrain from exposing the Children to emotional and physical harm.

Father argues there was insufficient evidence of detriment because throughout the proceedings, CFS recommended supervised visitation for Father, and there was no evidence that supervised visitation would be harmful to the Children. At the detention

19

hearing, he was granted two hours of visitation once a week. In the January 2023, jurisdiction/disposition report, CFS recommended continued supervised visitation for Father. But in CFS's March 2023, additional information report, CFS reported new circumstances which reinforced the court's and Children's counsel's concerns that visitation would be detrimental to the Children.

Even though supervised visitation and the restraining order would hopefully provide Mother and the Children with protection from Father, the court reasonably found visitation detrimental because there remained a risk of harm. The restraining order was only for one year and, as the Children's attorney and CFS stated during the jurisdiction/disposition hearing, Father's recent actions demonstrated that he continued to be obsessed with Mother, continued to harass her and engage in disturbing, inappropriate confrontations with her in the Children's presence, and seemed to have little, if any, control over his angry, volatile behavior when in Mother's presence, even when the Children were present.

Under such circumstances, the court reasonably found visitation was detrimental to the Children, including the two youngest children, because it posed a risk of the Children suffering physical and emotional harm as a result of Father's visitation.

E. *Move-Away Exit Order*

Father contends the juvenile court's exit order authorizing Mother to move away without providing notice to Father constitutes an abuse of discretion and violation of his due process rights. We disagree.

Family Code section 3024 provides that, "[i]n making an order for custody, if the court does not consider it inappropriate, the court may specify that a parent shall notify the other parent if the parent plans to change the residence of the child for more than 30 days, unless there is prior written agreement to the removal." This statute does not require the court to order a move-away notice. It is discretionary, and in the instant case, there was good reason to order that such notice was not required because there was substantial evidence Father posed a risk of emotional and physical harm to the Children and Mother.

Such evidence supporting the move-away order includes evidence of Father's history of instigating altercations with Mother in the presence of the Children; Father stalking and harassing Mother by persistently attempting to contact her, up until shortly before the jurisdiction/disposition hearing; the family law court granting Mother a one-year restraining order against Father; and Father's recent behavior reflecting he had not benefitted from services, as concluded by Mother's domestic violence therapist and CFS. Father continued to exhibit adverse behaviors, placing the Children and Mother at risk of harm, even though he had participated in numerous parent and domestic violence classes (10 each) and seven therapy sessions during the instant case, and prior to the dependency case, 23 anger management classes and individual and couples therapy. Father continued to demonstrate an inability to control his angry, volatile behavior when in Mother's presence, even when the Children were present. Father also had a history of mental

21

health issues, which tended to worsen during emotionally turbulent times and were triggered by adversity.

Even though the restraining order was intended to provide Mother with protection, the court reasonably found it was in the Children's best interests to allow Mother to move out of the county or state without notifying Father, because there remained the risk that Father would continue to pursue her wherever she moved, which would place her and the Children at risk of harm. In addition, the restraining order was for only one year, which would leave Mother and the Children unprotected and at greater risk of harm thereafter, when it expired in March 2024.

The juvenile court's move-away exit order is consistent with the public policy stated in Family Code section 3020, which states that "the health, safety, and welfare of children shall be the court's primary concern in determining the best interests of children when making any orders regarding the physical or legal custody or visitation of children. The Legislature further finds and declares that children have the right to be safe and free from abuse, and that the perpetration of child abuse or domestic violence in a household where a child resides is detrimental to the health, safety, and welfare of the child." (Fam. Code, § 3020, subd. (a).)

Family Code section 3020 further states that it is this state's public policy to ensure that children have frequent and continuing contact with both parents after the parents have ended their relationship, "except when the contact would not be in the best interests of the child." (Fam. Code, § 3020, subd. (b).) When there is a conflict between

these two policies, "a court's order regarding physical or legal custody or visitation shall be made in a manner that ensures the health, safety, and welfare of the child and the safety of all family members." (Fam. Code, § 3020, subd. (c).)

Here, where the Children were repeatedly exposed to domestic violence in their home, leading to the instant juvenile dependency proceedings, and Father continued to harass Mother, stalk her, and initiate altercations with her in the Children's presence, the trial court's move-away order was not an abuse of discretion, because it was in the Children's best interests. It furthered the public policy of ensuring the Children's "health, safety, and welfare . . . and the safety of all family members." (Fam. Code, § 3020, subd. (c).)

F. *Paternity as to J.M.*

Father contends the juvenile court prejudicially erred in entering an erroneous paternity finding that he is an alleged father of J.M., whereas Father's paternity test established that he is J.M.'s biological father, and there is evidence supporting a finding he is a presumed father.

1. Facts and Procedural History Regarding Paternity of J.M.

During the detention hearing in December 2022, Mother told the court that Father was J.M.'s father. She said Father was going to get a paternity DNA test because he did not believe he was J.M.'s father. Mother told the court that Father was present for the births of their first three children and named as the father on their birth certificates, but Father was not present at J.M.'s birth and is not named on J.M.'s birth certificate. The

23

court ordered Parents to complete the paternity inquiry form (JV-505) and submit it to CFS before the jurisdiction/disposition hearing.

CFS recommended in the jurisdiction/disposition hearing report filed in January 2023, that father be found the alleged father of J.M., and the presumed father of the other three children. CFS reported that Father "has recognized the children as his and has supported them financially." But, according to Mother, when she discovered she was pregnant with J.M., Father did not believe J.M. was his child because he found out Mother had been seeing another man. Mother and Father separated in July 2022. Mother did not want Father to know when J.M. was born. Mother told CFS she also doubted Father was J.M.'s biological father. She said Father did not recognize J.M. as his child.

CFS further reported that Father told CFS he doubted he was J.M.'s father and did not recognize J.M. as his child. He said he did not visit J.M. and preferred visits only with the other three children. Parents requested a paternity test. Because of these circumstances, CFS recommended the court find that Father was an alleged father of J.M. and a presumed father of the other three children.

During the jurisdiction/disposition hearing on January 10, 2023, Father requested a paternity test as to J.M., and agreed he is the presumed father of the other three children. The court made the requested order and finding, and continued the jurisdiction/disposition hearing.

In March, CFS reported in its additional information report that on January 25, 2023, CFS received Father's paternity results for J.M. They confirmed that Father is

24

J.M.'s biological father. A copy of the paternity test results was attached to the additional information report.

During the continued jurisdiction/disposition hearing on March 21, 2023, there was no discussion regarding Father's status as a father and the court made no findings during the hearing on whether Father was found to be an alleged, biological, or presumed father of J.M. or the other children. The March 21, 2023, minute order, however, states that Father is the alleged father of J.M. and presumed father of the other children. But the exit orders and final judgment entered on March 21, 2023, state that Father was declared by court order on January 10, 2023, to be the presumed father of all four children, including J.M.

2. Applicable Law

"'The extent to which a father may participate in dependency proceedings and his rights in those proceedings are dependent on his paternal status.' (*In re Paul H.* (2003) 111 Cal.App.4th 753, 760, italics omitted.)" (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 159.) "'Dependency law recognizes three types of fathers: presumed, alleged and biological.' (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1208.) A biological father is one whose paternity of the child has been established, but who has not established that he qualifies as the child's presumed father under Family Code section 7611. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15.) 'A man who may be the father of a child, but whose biological paternity has not been established, or, in the

25

alternative, has not achieved presumed father status, is an "alleged" father.' (*Ibid.*)" (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.)

"'Alleged fathers have less rights in dependency proceedings than biological and presumed fathers. [Citation.] An alleged father does not have a current interest in a child because his paternity has not yet been established. [Citation.]' (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1406.) . . . Due process for an alleged father requires only that he 'be given notice and "an opportunity to appear and assert a position and attempt to change his paternity status. [Citations.]"' (*Ibid.*)" (*In re Christopher M.*, *supra*, 113 Cal.App.4th at pp. 159-160.) "Section 316.2, subdivision (a) requires the court to inquire as to the identity of all presumed or alleged fathers, at the detention hearing or as soon after as practicable." (*In re Kobe A.*, *supra*, 146 Cal.App.4th at p. 1120.)

3. Discussion

The March 21, 2023, minute order for the jurisdiction/disposition hearing is inconsistent with the exit order included with the judgment. The minute order states that Father is an alleged father of J.M. The exit order (form JV-200) attached to the judgment states that Father is the presumed father of all of the Children, including J.M. The exit order states that the presumed father finding was made on January 10, 2023, but the transcript of the hearing states, to the contrary, that the court ordered paternity testing for Father as to J.M. on January 10, 2023, and found only as to the other children that he was their presumed father.

Because the paternity test results show that Father is J.M.'s biological father, and those test results were submitted to the court before the March 21, 2023, jurisdiction/disposition hearing, the court erred in not conducting a hearing and making findings on Father's paternity during the final jurisdiction/disposition hearing. Furthermore, the minute order erroneously states Father remained an alleged father when the DNA results established he is, at a minimum, a biological father. There is evidence in the record that, had the court addressed the issue, it likely would have found that he was either a biological father or a presumed father. Although the exit order states he is a presumed father of all of the Children, the exit order appears to have been erroneous, based on the inconsistencies in the minute order, the reporter's transcript of the hearing, and the exit order.

We conclude the error as to Father's paternity as to J.M. is prejudicial because it is unclear from the record whether the juvenile court intended to make a finding that Father is an alleged, biological, or presumed father of J.M. Had the court properly heard and made a finding on the record on the issue during the March 21, 2023, jurisdiction/disposition hearing, there is a reasonable probability the court would have either found Father is a biological or a presumed father of J.M. Father's paternity status significantly impacts his rights to visitation of J.M., not only during the juvenile dependency proceedings but also thereafter in the family law court. Therefore the finding regarding Father's status as to J.M. must be vacated and the case remanded to allow the juvenile court to properly make a finding regarding Father's paternity status as to J.M.

27

Because the matter is being remanded for a determination and finding on Father's paternity status as to J.M., Father's IAC objection that his attorney failed to request the court to find that Father is a presumed father, is moot.

G. *Due Process Objection*

As to the visitation exit order and the paternity status finding, Father's due process challenges are moot because the exit orders are reversed and the matter is remanded for reconsideration of the orders. As to the visitation detriment finding and move-away exit order, we further conclude there was no violation of Father's due process rights.

"Since the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him adequate notice and an opportunity to be heard. [Citations.]" (*In re B.G.* (1974) 11 Cal.3d 679, 688-689.) "Hence, the parenting right may not be interfered with in the absence of a 'compelling state interest.'" (*In re David B.* (1979) 91 Cal.App.3d 184, 192.) "Only in extreme cases may the parenting right be disturbed and then only when there is no reasonable alternative. . . . Our Supreme Court has emphasized the extreme gravity of the parenting right by focusing attention 'not on the unfitness of the parent but the *detriment to the child*.' [Citation.]" (*Ibid*.) A parent's civil right to parent a child is not absolute because the welfare of the child "is a compelling state interest that a state has not only a right, but a duty, to protect." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

Father argues he was denied his substantive due process rights because the exit orders effectively terminated his parental rights, were not narrowly tailored, and did not provide him with a meaningful opportunity to modify the exit orders in family law court in the future. Father maintains that the exit orders deprive him of any chance of seeing his Children again and reunifying with them, and modification of the orders is "nearly impossible" because he has no access to the Children and therefore cannot demonstrate changed circumstances or that changing the order was in the Children's best interests. He thus maintains that the orders, in effect, sever his parental relationship with the Children and preclude him from seeing his Children again, particularly if they move away without providing him with any notice of when or where they move. We disagree that the exit orders violate his due process rights.

First, it is unclear from the visitation exit orders whether the court intended to order termination of all visitation or continuation of supervised visitation. Therefore, this matter is being remanded as to the visitation order.

Second, regardless of the visitation order, the exit orders do not violate Father's substantive due process rights because the court did not terminate his parental rights to the Children. The exit orders are not final because they can be modified by the family law court upon a showing of changed circumstances and that modifying the orders is in the Children's best interests. (§§ 302, subd. (d), 366.26.)

Third, the exit orders do not preclude Father from demonstrating in the future, in family law court, changed circumstances, and that visitation is in the Children's best

29

interests. Contrary to Father's contention that there is no realistic path for him to reunify with the Children, there is a realistic path available for Father. He may show changed circumstances demonstrating he has adhered to the restraining order and has completely ceased contacting Mother for inappropriate reasons and harassing her. Other possible avenues to visitation might include participating in additional therapy and other beneficial programs and courses assisting Father in changing his destructive, harmful behaviors. Providing the court with reports, declarations, or testimony by mental health experts might also be helpful in establishing that Father is no longer obsessed with Mother, has ceased stalking and harassing her, and does not pose a risk of physical or emotional harm to Mother and the Children.

While it might be difficult for Father to demonstrate changed circumstances and that visitation is in the Children's best interests, succeeding in doing so is not "nearly impossible," as Father argues. In addition, as discussed above, there was substantial evidence that the court's visitation detriment finding and move-away order were in the Children's best interests because Father continued to be obsessed with Mother, stalking and harassing her, and inappropriately confronting her in the presence of the Children. This resulted in the family law court granting Mother a one-year restraining order, demonstrating that Father was a risk to Mother and, in turn, the Children.

The Children's well-being and safety take precedence over Father's parenting rights. (*In re T.S.*, *supra*, 52 Cal.App.5th at p. 513 ["'[T]he court's focus and primary consideration must always be the best interests of the child.'"].) Therefore, under the

circumstances in this case, we reject Father's due process objections to the exit orders and findings.

## IV.

## DISPOSITION

The exit orders challenged in this appeal are reversed and the juvenile dependency court, upon remand, is directed to reconsider and revise, to the extent necessary, the exit orders in accordance with this opinion.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

McKINSTER

Acting P. J.

MILLER

J.

31